RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0287p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

IN RE: MCP NO. 165, OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, INTERIM FINAL RULE: COVID-19 VACCINATION AND TESTING; EMERGENCY TEMPORARY STANDARD 86 FED. REG. 61402.

———————————————————————————————

MASSACHUSETTS BUILDING TRADES COUNCIL, et al. (21-7000); BENTKEY SERVICES, LLC (21-4027); PHILLIPS MANUFACTURING & TOWER COMPANY, et al. (21-4028); COMMONWEALTH OF KENTUCKY, et al. (21-4031); ANSWERS IN GENESIS, INC. (21-4032); SOUTHERN BAPTIST THEOLOGICAL SEMINARY, et al. (21-4033); BST HOLDINGS, LLC, et al. (21-4080); REPUBLICAN NATIONAL COMMITTEE (21-4082); ASSOCIATED BUILDERS AND CONTRACTORS, INC., et al. (21-4083); MASSACHUSETTS BUILDING TRADES COUNCIL (21-4084); UNION OF AMERICAN PHYSICIANS AND DENTISTS (21-4085); ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC., et al. (21-4086); NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES & TECHNICIANS, THE BROADCASTING AND CABLE TELEVISION WORKERS SECTOR OF THE COMMUNICATIONS WORKERS OF AMERICA, LOCAL 51, AFL-CIO (21-4087); STATE OF MISSOURI, et al. (21-4088); UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPE FITTING INDUSTRY OF THE UNITED STATES AND CANADA, AFL-CIO (21-4089); STATE OF INDIANA (21-4090); TANKCRAFT CORPORATION, et al. (21-4091); NATIONAL ASSOCIATION OF HOME BUILDERS (21-4092); JOB CREATORS NETWORK, et al. (21-4093); UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL/CIO-CLC, et al. (21-4094); SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ (21-4095); MFA, INC., et al. (21-4096); STATE OF FLORIDA, et al. (21-4097); AFT PENNSYLVANIA (21-4099); DENVER NEWSPAPER GUILD, COMMUNICATIONS WORKERS OF AMERICA, LOCAL 37074, AFL-CIO (21-4100); DTN STAFFING, INC., et al. (21-4101); FABARC STEEL SUPPLY, INC., et al. (21-4102); MEDIA GUILD OF THE WEST, THE NEWS GUILD-COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO, LOCAL 39213 (21-4103); NATURAL PRODUCTS ASSOCIATION (21-4108); OBERG INDUSTRIES, LLC (21-4112); BETTEN CHEVROLET, INC. (21-4114); TORE SAYS LLC (21-4115); KENTUCKY PETROLEUM MARKETERS ASSOCIATION, et al. (21-4117); AARON ABADI (21-4133),

> Nos. 21-7000
> /4027 /4028 /4031
> /4032 /4033 /4080
> /4082 /4083 /4084
> /4085 /4086 /4087
> /4089 /4088 /4090
> /4091 /4093 /4092
> /4095 /4094 /4096
> /4097 /4099 /4100
> /4101 /4102 /4103
> /4108 /4112 /4114
> /4115 /4117 /4133

*Petitioners,*

*v.*

UNITED STATES DEPARTMENT OF LABOR, OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, et al.,

*Respondents.*

On Emergency Motion to Dissolve Stay.

Multi-Circuit Petitions for Review from an Order of the U.S. Department of Labor, Occupational Safety and Health Administration, No. OSHA-2001-0007.

Decided and Filed:  December 17, 2021

Before:  GIBBONS, STRANCH, and LARSEN, Circuit Judges.

————————

**COUNSEL**

**ON  EMERGENCY MOTION TO DISSOLVE STAY AND REPLY:**  Sarah E. Harrington, Michael S. Raab, Adam C. Jed, Brian J. Springer, Martin Totaro, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents.  **IN RESPONSE:**  R. Trent McCotter, BOYDEN GRAY & ASSOCIATES, Washington, D.C., for Job Creators Network Petitioners.  Felicia K. Watson, NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, Washington, D.C., for Petitioner National Association of Home Builders of the United States.  Christopher Wiest, CHRIS WIEST, ATTORNEY AT LAW, PLLC, Crestview Hills, Kentucky, for Petitioner Betten Chevrolet, Inc.  Harold Craig Becker, AMERICAN  FEDERATION  OF  LABOR  AND  CONGRESS  OF  INDUSTRIAL ORGANIZATIONS, Washington, D.C., Peter J. Ford, UNITED FOOD & COMMERCIAL WORKERS INTERNATIONAL UNION, Washington, D.C., Randy Rabinowitz, OSH LAW PROJECT, LLC, Washington, D.C., Andrew D. Roth, BREDHOFF & KAISER, PLLC, Washington, D.C., Nicole Berner, SERVICE EMPLOYEES INTERNATIONAL UNION, Washington, D.C., Keith R. Bolek, O'DONOGHUE & O'DONOGHUE LLP, Washington, D.C., Victoria L. Bor, SHERMAN DUNN, P.C., Washington, D.C., for Petitioner Union of American Physicians and Dentists.  Cathleen A. Martin, John A. Ruth, NEWMAN, COMLEY & RUTH, P.C., Jefferson City, Missouri, for MFA Incorporated Petitioners.  Benjamin M. Flowers, May Davis, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, Christopher L. Thacker, Lindsey R. Keiser, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, Clark L. Hildabrand, Brandon J. Smith, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, Brian Kane, Leslie M. Hayes, Megan A. Larrondo, OFFICE OF THE IDAHO ATTORNEY GENERAL, Boise, Idaho, Jeffrey A. Chanay, OFFICE OF THE KANSAS ATTORNEY GENERAL, Topeka, Kansas, Mithun Mansinghani, OFFICE OF THE OKLAHOMA ATTORNEY GENERAL, Oklahoma City, Oklahoma, Lindsay S. See, OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL, Charleston, West Virginia, Edmund G. LaCour Jr., OFFICE OF THE ALABAMA ATTORNEY GENERAL, Montgomery, Alabama, Charles E. Brasington, OFFICE OF THE ALASKA ATTORNEY GENERAL, Anchorage, Alaska, Drew C. Ensign, OFFICE OF THE ARIZONA ATTORNEY GENERAL, Phoenix, Arizona, D. John Sauer, OFFICE OF THE MISSOURI ATTORNEY GENERAL, Jefferson City, Missouri, David M. S. Dewhirst, Christian B. Corrigan, OFFICE OF THE MONTANA ATTORNEY GENERAL, Helena, Montana, Nicholas J. Bronni, Vincent M. Wagner, OFFICE OF THE ARKANSAS ATTORNEY GENERAL, Little

Rock, Arkansas, Henry C. Whitaker, Jason H. Hilborn, OFFICE OF THE FLORIDA ATTORNEY GENERAL, Tallahassee, Florida, James A. Campbell, OFFICE OF THE NEBRASKA ATTORNEY GENERAL, Lincoln, Nebraska, Anthony J. Galdieri, OFFICE OF THE NEW HAMPSHIRE ATTORNEY GENERAL, Concord, New Hampshire, Matthew A. Sagsveen, OFFICE OF THE NORTH DAKOTA ATTORNEY GENERAL, Bismarck, North Dakota, Ross W. Bergethon, OFFICE OF THE GEORGIA ATTORNEY GENERAL, Atlanta, Georgia, Thomas M. Fisher, OFFICE OF THE INDIANA ATTORNEY GENERAL, Indianapolis, Indiana, Thomas T. Hydrick, OFFICE OF THE SOUTH CAROLINA ATTORNEY GENERAL, Columbia, South Carolina, Samuel P. Langholz, OFFICE OF THE IOWA ATTORNEY GENERAL, Des Moines, Iowa, Elizabeth B. Murrill, OFFICE OF THE LOUISIANA ATTORNEY GENERAL, Baton Rouge, Louisiana, Judd E. Stone II, William F. Cole, Ryan S. Baasch, OFFICE OF THE TEXAS ATTORNEY GENERAL, Austin, Texas, Melissa A. Holyoak, OFFICE OF THE UTAH ATTORNEY GENERAL, Salt Lake City, Utah, John V. Coghlan, OFFICE OF THE MISSISSIPPI ATTORNEY GENERAL, Jackson, Mississippi, Ryan Schelhaas, OFFICE OF THE WYOMING ATTORNEY GENERAL, Cheyenne, Wyoming, for State Petitioners. Michael E. Toner, Thomas M. Johnson, Jr., Stephen J. Obermeier, Jeremy J. Broggi, Krystal B. Swendsboe, WILEY REIN LLP, Washington, D.C., for Petitioner Republican National Committee. Daniel P. Lennington, WISCONSIN INSTITUTE FOR LAW & LIBERTY, Milwaukee, Wisconsin, for Tankcraft Petitioners. Matthew R. Miller, Robert Henneke, Chance Weldon, Nathan Curtisi, TEXAS PUBLIC POLICY FOUNDATION, Austin, Texas, for Burnett Specialists Petitioners. John Stone Campbell III, John P. Murrill, TAYLOR, PORTER, BROOKS, & PHILLIPS L.L.P., Baton Rouge, Louisiana, for Cox Operating Petitioners. Jessica Hart Steinmann, Josh Campbell, Rachel Jag, AMERICA FIRST POLICY INSTITUTE, Washington, D.C., Kris W. Kobach, ALLIANCE FOR FREE CITIZENS, Lecompton, Kansas, for DTN Staffing Petitioners. Daniel R. Suhr, M. E. Buck Dougherty III, LIBERTY JUSTICE CENTER, Chicago, Illinois, Sarah Harbison, PELICAN INSTITUTE FOR PUBLIC POLICY, New Orleans, Louisiana, for BST Holdings Petitioners. Kurtis T. Wilder, Joseph E. Richotte, Steven R. Eatherly, BUTZEL LONG, P.C., Detroit, Michigan, for Petitioner Small Business Association of Michigan. Henry M. Perlowski, Ashley S. Kelly, ARNALL GOLDEN GREGORY LLP, Atlanta, Georgia, Richard J. Oparil, ARNALL GOLDEN GREGORY LLP, Washington, D.C., for Petitioner Natural Products Association. Robert Alt, THE BUCKEYE INSTITUTE, Columbus, Ohio, Patrick Strawbridge, CONSOVOY MCCARTHY PLLC, Boston, Massachusetts, for Petitioner Phillips Manufacturing & Tower Company. David A. Cortman, John J. Bursch, Matthew S. Bowman, Frank H. Chang, ALLIANCE DEFENDING FREEDOM, Washington, D.C., Ryan L. Bangert, Ryan J. Tucker, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, for Southern Baptist Theological Seminary Petitioners. Jordan A. Sekulow, Abigail A. Southerland, Miles Terry, Christy Stierhoff, AMERICAN CENTER FOR LAW & JUSTICE, Washington, D.C., Edward L. White III, AMERICAN CENTER FOR LAW & JUSTICE, Ann Arbor, Michigan, for Petitioner Heritage Foundation. Steven P. Lehotsky, Scott A. Keller, Michael B. Schon, LEHOTSKY KELLER LLP, Washington, D.C., for Business Association Petitioners. Matthew J. Clark, ALABAMA CENTER FOR LAW AND LIBERTY, Birmingham, Alabama, for FabArc Steel Supply Petitioners. J. Larry Stine, WIMBERLY, LAWSON, STECKEL,

SCHNEIDER & STINE, P.C., Atlanta, Georgia, for Associated Builders and Contractors Petitioners. Jeffrey C. Mateer, Hiram S. Sasser III, David J. Hacker, Jeremiah G. Dys, Lea E. Patterson, Keisha T. Russell, FIRST LIBERTY INSTITUTE, Plano, Texas, for Answers in Genesis Petitioners. David A. Cortman, John J. Bursch, Matthew S. Bowman, Frank H. Chang, ALLIANCE DEFENDING FREEDOM, Washington, D.C., Ryan L. Bangert, Ryan J. Tucker, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, Harmeet K. Dhillon, Ronald D. Coleman, Mark P. Meuser, Michael A. Columbo, DHILLON LAW GROUP INC., San Francisco, California, for Petitioner Bentkey Services. Aaron Abadi, New York, New York, pro se. **ON AMICUS BRIEF:** Brianne Gorod, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C., Scott E. Rosenow WMC LITIGATION CENTER, Madison, Wisconsin, Catherine L. Strauss, ICE MILLER LLP, Columbus, Ohio, Sheng Li, NEW CIVIL LIBERTIES ALLIANCE, Washington, D.C., Emmy L. Levens, COHEN MILSTEIN SELLERS & TOLL PLLC, Washington, D.C., Rachel L. Fried, Jessica Anne Morton, Jeffrey B. Dubner, JoAnn Kintz, DEMOCRACY FORWARD FOUNDATION, Washington, D.C., Scott L. Nelson, Allison M. Zieve, PUBLIC CITIZEN LITIGATION GROUP, Washington, D.C., Michael T. Anderson, Adam C. Breihan, MURPHY ANDERSON PLLC, Washington, D.C., Deepak Gupta, GUPTA WESSLER PLLC, Washington, D.C., for Amici Curiae.

STRANCH, J., delivered the opinion of the court in which GIBBONS, J., joined. GIBBONS, J. (pg. 38), delivered a separate concurring opinion. LARSEN, J. (pp. 39–57), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

JANE B. STRANCH, Circuit Judge. The COVID-19 pandemic has wreaked havoc across America, leading to the loss of over 800,000 lives, shutting down workplaces and jobs across the country, and threatening our economy. Throughout, American employees have been trying to survive financially and hoping to find a way to return to their jobs. Despite access to vaccines and better testing, however, the virus rages on, mutating into different variants, and posing new risks. Recognizing that the "old normal" is not going to return, employers and employees have sought new models for a workplace that will protect the safety and health of employees who earn their living there. In need of guidance on how to protect their employees from COVID-19 transmission while reopening business, employers turned to the Occupational Safety and Health Administration (OSHA or the Agency), the federal agency tasked with assuring a safe and healthful workplace. On November 5, 2021, OSHA issued an Emergency

Temporary Standard (ETS or the standard) to protect the health of employees by mitigating spread of this historically unprecedented virus in the workplace. The ETS requires that employees be vaccinated or wear a protective face covering and take weekly tests but allows employers to choose the policy implementing those requirements that is best suited to their workplace. The next day, the U.S. Court of Appeals for the Fifth Circuit stayed the ETS pending judicial review, and it renewed that decision in an opinion issued on November 12. Under 28 U.S.C. § 2112(a)(3), petitions challenging the ETS—filed in Circuits across the nation—were consolidated into this court. Pursuant to our authority under 28 U.S.C. § 2112(a)(4), we **DISSOLVE** the stay issued by the Fifth Circuit for the following reasons.

## I. BACKGROUND

### A. OSHA's History and Authority

Congress passed the Occupational Safety and Health Act of 1970 (OSH Act or the Act) and established OSHA "to assure safe and healthful working conditions for the nation's work force and to preserve the nation's human resources." *Asbestos Info. Ass'n/N. Am. v. Occupational Safety & Health Admin.*, 727 F.2d 415, 417 (5th Cir. 1984). It expressly found that "personal injuries and illnesses arising out of work situations impose a substantial burden upon, and are a hindrance to, interstate commerce in terms of lost production, wage loss, medical expenses, and disability compensation payments." 29 U.S.C. § 651(a). OSHA is charged with ensuring worker safety and health "by developing innovative methods, techniques, and approaches for dealing with occupational safety and health problems." *Id.* § 651(b)(5). To fulfill that charge, Congress authorized the Secretary of Labor (the Secretary) "to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce." *Id.* § 651(b)(3). And it vested the Secretary with "broad authority . . . to promulgate different kinds of standards" for health and safety in the workplace. *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 611 (1980) (plurality opinion); *see, e.g.*, *N. Am.'s Bldg. Trades Unions v. Occupational Safety & Health Admin.*, 878 F.3d 271, 281 (D.C. Cir. 2017); *United Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1202, 1311 (D.C. Cir. 1980); 29 C.F.R. §§ 1910.141, 1926.51.

An occupational safety and health standard is one that "requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8). Before going into effect, OSHA's standards must undergo a notice-and-comment period for 30 days, during which time anyone who objects to the standard may request a public hearing. *Id.* § 655(b)(2)–(3). Within 60 days from the end of the notice-and-comment period, the Secretary must either publish the standard or decline to issue the standard. *Id.* § 655(b)(4). The Secretary has set standards that affect workplaces across the country in a wide range of categories, including sanitation, air contaminants, hazardous materials, personal protective equipment, and fire protection. *See* National Consensus Standards and Established Federal Standards, 36 Fed. Reg. 10,466 (May 29, 1971).

In emergency circumstances, OSHA "shall" promulgate an "emergency temporary standard" that takes "immediate effect." 29 U.S.C. § 655(c)(1). Emergency temporary standards do not displace notice-and-comment requirements; rather, the ETS serves as the "proposed rule," and OSHA must proceed over the course of six months with the notice-and-comment procedures of a normal OSHA standard. *Id.* § 655(c)(2), (3). At the end of that period, the Secretary must promulgate either the same standard or a revised standard in light of the notice-and-comment process. *Id.* § 655(c)(2). Before issuing an ETS, OSHA must determine: (1) "that employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from new hazards," and (2) that an "emergency standard is necessary to protect employees from such danger." *Id.* § 655(c)(1).

With respect to any OSHA standard—emergency or otherwise—employers may seek a "variance" from the standard. *Id.* § 655(d). Under that provision, an employer must demonstrate "that the conditions, practices, means, methods, operations, or processes used or proposed to be used by an employer will provide employment and places of employment to his employees which are as safe and healthful as those which would prevail if he complied with the standard." *Id.*

## B.  Factual Background

OSHA monitored the COVID-19 pandemic from the beginning.  As early as April 2020, OSHA sought to protect workers through "widespread voluntary compliance" with "safety guidelines," specifying that workplaces should comply with personal protective equipment standards, *see* 29 C.F.R. § 1910, and by reinforcing employers' "general duty" to furnish each worker "employment and a place of employment, which are free from recognized hazards that are causing or are likely to cause death or serious physical harm," *see* 29 U.S.C. § 654(a)(1). Given the pandemic's trajectory—and the emergence of rapidly-spreading variants causing "increases in infectiousness and transmission," 86 Fed. Reg. at 61,409—OSHA found that its "nonregulatory enforcement tools" were "inadequate" to ensure all working individuals "safe and healthful working conditions." 29 U.S.C. § 651(b); *see* 86 Fed. Reg. at 61,410–45.

Determining that the continued spread of COVID-19 met the two requirements of § 655(c)(1), on November 5, 2021, OSHA published an ETS to fulfill its statutory directive and address the "extraordinary and exigent circumstances" presented by this unprecedented pandemic.  86 Fed. Reg. at 61,434.  OSHA published a 153-page preamble to the ETS to explain the bases for its decision to issue the ETS under 29 U.S.C. § 655(c).  *See* COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 Fed. Reg. 61,402 (Nov. 5, 2021) (to be codified at 29 C.F.R. pts. 1910, 1915, 1917, 1918, 1926, and 1928).

The ETS does not require anyone to be vaccinated.  Rather, the ETS allows covered employers—employers with 100 or more employees—to determine for themselves how best to minimize the risk of contracting COVID-19 in their workplaces.  *Id.* at 61,438 (allowing employers to "opt out" of any vaccination policies).  Employers have the option to require unvaccinated workers to wear a mask on the job and test for COVID-19 weekly.  *Id.*  They can also require those workers to do their jobs exclusively from home, and workers who work exclusively outdoors are exempt.  *Id.* at 61,419.  The employer—not OSHA—can require that its workers get vaccinated, something that countless employers across the country have already done.  *Id.* at 61,436 ("[T]his ETS offers employers a choice in how to comply . . . .").

Employers must also confirm their employees' vaccination status and keep records of that status. *Id.* at 61,552. Consistent with other OSHA standard penalties, employers who fail to follow the standard may be fined penalties up to $13,653 for each violation and up to $136,532 for each willful violation. 29 C.F.R. § 1903.15(d).

## C. Procedural History

Shortly after OSHA issued the ETS, private employers, labor unions, state governments, and individual citizens across the country filed suit in virtually every circuit court, challenging OSHA's authority to issue such an ETS and OSHA's basis for the ETS. One day after the ETS went into effect, the Fifth Circuit issued a stay barring OSHA from enforcing the ETS until the completion of judicial review. *BST Holdings, LLC v. Occupational Safety & Health Admin.*, No. 21-60845, 2021 WL 5166656 (5th Cir. Nov. 6, 2021) (per curiam). Less than a week later, the Fifth Circuit issued a written opinion, reaffirming the initial stay after "having conducted . . . [an] expedited review." *BST Holdings, LLC v. Occupational Safety & Health Admin.*, 17 F.4th 604 (5th Cir. 2021).

In reaching its decision to stay the ETS, the Fifth Circuit generally forecasted that the ETS faced fatal statutory and constitutional issues, then concluded that the Petitioners had demonstrated a strong likelihood of success on the merits. *Id.* at 611–18. On the other stay factors, the Fifth Circuit found that individuals, states, and employers would be "substantially burdened" due to the compliance costs, loss of constitutional freedom, and intrusion into States' "constitutionally reserved police power." *Id.* at 618. Without addressing any of OSHA's factual explanations or its supporting scientific evidence concerning harm, the Fifth Circuit summarily concluded that "a stay will do *OSHA* no harm whatsoever" and "a stay is firmly in the public interest." *Id.* at 618–19 (emphasis in original).

Under 28 U.S.C. § 2112(a)(3), the Government notified the judicial panel on multidistrict litigation of petitions across multiple circuits, invoking the lottery procedure to consolidate all petitions in a single circuit. On November 16, the panel designated the U.S. Court of Appeals for the Sixth Circuit to review the petitions. On November 23, the Government moved to

dissolve the stay issued by the Fifth Circuit pursuant to § 2112(a)(4), which provides that the court of appeals chosen through the multi-circuit lottery may modify, revoke, or extend a stay that a court of appeals issued before the lottery.

## II.  ANALYSIS

Relying primarily on the evidence and authority set out in its 153-page preamble, OSHA moved to dissolve the Fifth Circuit's stay.  Under 28 U.S.C. § 2112(a)(4), we review de novo the challenged aspects of the ETS to determine whether the Fifth Circuit's stay should be modified, revoked, or extended.

### A.  Standard for Stay

"A stay is an 'intrusion into the ordinary processes of administration and judicial review.'"  *Nken v. Holder*, 556 U.S. 418, 427 (2009) (quoting *Va. Petroleum Jobbers Ass'n. v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).  Therefore, it "is not a matter of right, even if irreparable injury might otherwise result to the appellant."  *Id.* (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)).  "[T]he heavy burden for making out a case for such extraordinary relief" rests on "the moving parties."  *Winston-Salem/Forsyth Cnty. Bd. of Educ. v. Scott*, 404 U.S. 1221, 1231 (1971); *see also Nken*, 556 U.S. at 433–34.

To determine whether a stay pending judicial review is merited, we consider four factors:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 426 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

### B.  Likelihood of Success on the Merits

#### 1.  Scope of OSHA's Statutory Authority

Petitioners' arguments are primarily grounded in the Fifth Circuit's blanket conclusion that the ETS is beyond the scope of OSHA's statutory authority.  The ETS was issued under

§ 655(c)(1) of the Act, which requires OSHA to issue an emergency standard if necessary to protect workers from a "grave danger" presented by "exposure to substances or agents determined to be toxic or physically harmful or from new hazards." 29 U.S.C. § 655(c)(1). In assessing that authority, the Fifth Circuit focused solely on the words in § 655(c)(1): "substances or agents," "toxic or physically harmful," and "grave danger," opining that those words are to be interpreted based on the words and phrases in the immediate vicinity of the statutory language at issue. *BST Holdings*, 17 F.4th at 612–13. But the Supreme Court has instructed that words and phrases must be viewed in the context of the entire statute. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 99 (1992) (instructing that, when evaluating a statute, a court "must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law"). We therefore take a holistic view of the language that Congress chose to include in its statutory authorization to OSHA.

An "agent" is "a chemically, physically, or biologically active principle." *Agent*, Merriam-Webster Collegiate Dictionary, https://unabridged.merriam-webster.com/collegiate/agent. And a virus is defined, in part, as "any large group of submicroscopic infectious agents." *Virus*, Merriam-Webster Collegiate Dictionary, https://unabridged.merriam-webster.com/collegiate/virus. The statute requires OSHA to determine whether an agent is "toxic *or* physically harmful *or* from new hazards," 29 U.S.C. § 655(c)(1) (emphasis added), speaking in the disjunctive, which specifies that words so connected "are to be given separate meanings," *Loughrin v. United States*, 573 U.S. 351, 357 (2014) (quoting *United States v. Woods*, 571 U.S. 31, 45–46 (2013)). To conflate two descriptors into one meaning would improperly render one disjunctive phrase superfluous. *See Bailey v. United States*, 516 U.S. 137, 146 (1995); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338–39 (1979). Under the statutory definition, any agent, including a virus, that is *either* "toxic" (i.e., poisonous, toxicity) *or* "physically harmful" (i.e., causing bodily harm) falls within OSHA's purview. An agent that causes bodily harm—a virus—falls squarely within the scope of that definition.

Other provisions of the Act reinforce OSHA's authority to regulate infectious diseases and viruses. As explained above, Congress enacted the OSH Act under the Commerce Clause

because Congress found that "*illnesses arising out of work situations* impose a substantial burden upon . . . interstate commerce." 29 U.S.C § 651(a) (emphasis added). Congress created the safety and *health* administration to protect workers from those illnesses by reducing "health hazards at their places of employment." *Id.* § 651(b)(1). The Act's objectives include exploring "ways to discover latent diseases, establishing causal connections between diseases and work in environmental conditions, and conducting other research relating to health problems . . . ." *Id.* § 651(b)(6). And finally, the Act sought to "provid[e] medical criteria which will assure insofar as practicable that no employee will suffer diminished health, functional capacity, or life expectancy as a result of his work experience." *Id.* § 651(b)(7).

Section 20 of the OSH Act provides for OSHA to work with and through other agencies by expressly directing the Secretary of Health and Human Services to conduct research in consultation with the Secretary of Labor to develop "information regarding potentially toxic substances or harmful physical agents," including through medical examination and tests. *Id.* § 669(a)(5). That provision also contains the religious exemption for the entire OSH Act: "[n]othing in this or any other provision of this chapter shall be deemed to authorize or require medical examination, immunization, or treatment, for those who object thereto on religious grounds, except where such is necessary for the protection of the health or safety of others." *Id.* The provision's reference to immunization and its creation of a limited exception to the Act's authorization of standards involving immunization would be rendered meaningless if the statute did not contemplate both that "harmful agents" include infectious, disease-causing agents, such as viruses, and that OSHA would employ the use of immunizations to combat those agents.

Congress confirmed OSHA's infectious disease authority in other statutes. In 1989, OSHA proposed a standard governing bloodborne pathogens to curb transmission rates of HIV, hepatitis B (HBV), and hepatitis C. *See* Occupational Exposure to Bloodborne Pathogens, 54 Fed. Reg. 23,042 (proposed May 30, 1989). When the standard had not been finalized by 1991, Congress ordered OSHA to finalize its rulemaking by a date certain, "warning that if [OSHA] did not meet its deadline, the proposed standard would become effective in the interim." Dale and Tracy, Occupational Safety and Health Law 64 (2018). In 1992, Congress passed the

Workers Family Protection Act, codified in 29 U.S.C. § 671a, the same U.S. Code chapter as the OSH Act. The statute resulted from findings that "hazardous chemicals and substances" were being transported home on workers and their clothing posing a "threat to the health and welfare of workers and their families." 29 U.S.C. § 671a(b)(1)(A)–(B). Section 671a requires the National Institute for Occupational Safety and Health to work with OSHA to study "issues related to the contamination of workers' homes with hazardous chemicals and substances, *including infectious agents*, transported from the workplaces of such workers." *Id.* § 671a(c)(1)(A) (emphasis added). OSHA is then specifically required to consider the need for additional standards on the studied issues and to promulgate such standards "pursuant to . . . the Occupational Safety and Health Act of 1970." *Id.* § 671a(d)(2).

In 2000, Congress passed the Needlestick Safety and Prevention Act, directing OSHA to strengthen its bloodborne pathogens standard and provide language for the regulatory text. Pub. L. No. 106-430, 114 Stat. 1901 (2000). Although legal challenges were brought against the standard, no party challenged OSHA's authority to regulate bloodborne pathogens. *See Am. Dental Ass'n v. Martin*, 984 F.2d 823, 826 (7th Cir. 1993). Removing any basis for doubt that OSHA is authorized to regulate infectious diseases, Congress expressly included funding for OSHA in the American Rescue Plan that is to be used "to carry out COVID-19 related worker protection activities." Pub. L. No. 117-2, § 2101, 135 Stat. 4, 30 (2021).

Based on the OSH Act's language, structure, and Congressional approval, OSHA has long asserted its authority to protect workers against infectious diseases. In 1991, it promulgated a standard regarding exposure to bloodborne pathogens. Occupational Exposure to Bloodborne Pathogens; Final Rule; 56 Fed. Reg. 64,004 (1991) (codified at 29 C.F.R. § 1910.1030). That standard required employers to make the hepatitis B vaccine available to employees at risk of exposure to HBV. 29 C.F.R. § 1910.1030(f). OSHA has also promulgated standards requiring employers engaged in hazardous waste cleanup to protect against any "biological agent and other disease-causing agent" that "upon exposure, ingestion, inhalation or assimilation into any person,. . . will or may reasonably be anticipated to cause death [or] disease," *id.* § 1910.120(a)(3); requiring use of respirators to prevent occupational diseases caused by

"harmful dusts, fogs, fumes, mists, gases, smokes, sprays, or vapors," *id.* § 1910.134(a)(1); and requiring employers to provide adequate toilet and handwashing facilities to protect workers from pesticides and prevent the spread of harmful bacteria and disease, *id.* § 1910.141; *see also* Field Sanitation, 52 Fed. Reg. 16,050, 16,087, 16,090–91 (May 1, 1987) (codified at 29 C.F.R. § 1928.110) (requiring construction employers to ban the use of common drinking cups to avoid the risk of contracting diseases); 29 C.F.R. § 192.51(a)(4).

Given OSHA's clear and exercised authority to regulate viruses, OSHA necessarily has the authority to regulate infectious diseases that are not unique to the workplace. Indeed, no virus—HIV, HBV, COVID-19—is unique to the workplace and affects only workers. And courts have upheld OSHA's authority to regulate hazards that co-exist in the workplace and in society but are at heightened risk in the workplace. *See, e.g.*, *Forging Indus. Ass'n v. Sec'y of Labor*, 773 F.2d 1436, 1442–43 (4th Cir. 1985) (*en banc*) (rejecting the argument that "because hearing loss may be sustained as a result of activities which take place outside the workplace . . . OSHA acted beyond its statutory authority by regulating non-occupational conditions or causes"); *Am. Dental Ass'n*, 984 F.2d at 826 (recognizing that the "infectious character of HIV and HBV warrant[s] even on narrowly economic grounds more regulation than would be necessary in the case of a noncommunicable disease"); *see also* 29 C.F.R. § 1910.1025 (OSHA regulates workplace exposure to lead).

Longstanding precedent addressing the plain language of the Act, OSHA's interpretations of the statute, and examples of direct Congressional authorization following the enactment of the OSH Act all show that OSHA's authority includes protection against infectious diseases that present a significant risk in the workplace, without regard to exposure to that same hazard in some form outside the workplace.

The responsibility the Act imposes on OSHA to protect the safety and health of employees, moreover, is hardly limited to "hard hats and safety goggles." OSHA has wide discretion to form and implement the best possible solution to ensure the health and safety of all workers, and has historically exercised that discretion. *See United Steelworkers of Am.*, 647 F.2d at 1260. Having been charged by the Act with creating such health-based standards, it makes

sense that OSHA's authority contemplates the use of medical exams and vaccinations as tools in its arsenal. *See id.* at 1228–40 (concluding that OSHA has the authority to require medical surveillance of lead levels). "To suggest otherwise would mean that Congress had to have anticipated both the unprecedented COVID-19 pandemic and the unprecedented politicization of the disease to regulate vaccination against it." *Florida v. Dep't of Health & Hum. Servs.*, No. 21-14098-JJ, 2021 WL 5768796, at \*12 (11th Cir. Dec. 6, 2021). No such prescience is required to address the health and safety concerns of American workers as they seek to return to their workplaces. The language of the OSH Act plainly authorizes OSHA to act on its charge "to assure safe and healthful working conditions for the nation's work force and to preserve the nation's human resources." *Asbestos Info. Ass'n*, 727 F.2d at 417.

### 2. Major Questions Doctrine

Having established OSHA's statutory authority, we pause to address Petitioners' and the Fifth Circuit's arguments pertaining to the major questions doctrine. The Fifth Circuit's complete discussion of the point is contained in a single paragraph:

> [T]he major questions doctrine confirms that the Mandate exceeds the bounds of OSHA's statutory authority. Congress must "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." The Mandate derives its authority from an old statute employed in a novel manner, imposes nearly $3 billion in compliance costs, involves broad medical considerations that lie outside of OSHA's core competencies, and purports to definitively resolve one of today's most hotly debated political issues. There is no clear expression of congressional intent in § 655(c) to convey OSHA such broad authority, and this court will not infer one. Nor can the Article II executive breathe new power into OSHA's authority—no matter how thin patience wears.

*BST Holdings*, 17 F.4th at 617–18 (citations and footnote omitted) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

The seldom-used major questions doctrine is a canon of statutory interpretation that has been described as an exception to *Chevron* deference. *See, e.g.*, *King v. Burwell*, 576 U.S. 473, 485–86 (2015). If any agency's regulatory action "bring[s] about an enormous and transformative expansion in [the agency's] regulatory authority," then there must be "clear

congressional authorization." *Util. Air Regul. Grp.*, 573 U.S. at 324. "We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)). The doctrine itself is hardly a model of clarity, and its precise contours—specifically, what constitutes a question concerning deep economic and political significance—remain undefined.

The major questions doctrine is inapplicable here, however, because OSHA's issuance of the ETS is not an enormous expansion of its regulatory authority. OSHA has regulated workplace health and safety on a national scale since 1970, including controlling the spread of disease. *See Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 520 (1981). As cataloged at length above, vaccination and medical examinations are both tools that OSHA historically employed to contain illness in the workplace. The ETS is not a novel expansion of OSHA's power; it is an existing application of authority to a novel and dangerous worldwide pandemic.

The dissent assumes our conclusion rests on the length of time (since 1970) OSHA has regulated workplaces and that we miss the point that the major questions doctrine is also about the "*scope* or *degree*" of the power an agency wields. (Dissent Op. at 53) Our conclusion rests on much more, including: An extensive catalog of OSHA's regulatory authority, citing the text of the Act and precedent, both replete with references that contemplate the authority OSHA uses here; the actual components of OSHA's work—such as its many years of regulating illness in the workplace; and other statutes acknowledging OSHA's authority, including one that expressly allocates funding to OSHA for its intervention in the COVID-19 crisis. This listing shows that OSHA was granted the authority that it exercised. The case cited by the dissent, *FDA v. Brown & Williamson Tobacco Corporation*, is inapposite because there the FDA made the claim that its authority to regulate "drugs" extended to cigarettes, but Congress had *repeatedly* declined to grant the FDA that authority. *See* 529 U.S. at 125, 137–39.

Any doubt as to OSHA's authority is assuaged by the language of the OSH Act. In arguing that OSHA does not have this authority, Petitioners and the Fifth Circuit rely on the Supreme Court's and the Sixth Circuit's recent cases invoking the major questions doctrine

regarding a nationwide moratorium on evictions in counties experiencing high levels of COVID-19 transmission. *See Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485 (2021); *Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 5 F.4th 666 (6th Cir. 2021). The Centers for Disease Control and Prevention (CDC) promulgated the moratorium under § 361(a) of the Public Health Service Act (PHSA), referencing its "broad authority to take whatever measures it deems necessary to control the spread of COVID-19." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2488. The Supreme Court determined that clear language in the PHSA expressly limited the scope of the CDC's authority to specific measures, which scope did not include moratoria. *Id.* The Court noted that "[e]ven if the text were ambiguous, the sheer scope of the CDC's claimed authority under § 361(a) would counsel against the Government's agency interpretation." *Id.* at 2489. Because 80 percent of the United States population fell within the moratorium, which would cost nearly $50 billion, and the moratorium intruded into an area traditionally left to the States, landlord-tenant law, the Court noted that if Congress wished the CDC to have such authority, it needed to "enact exceedingly clear language" to that effect. *Id.* (quoting *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1850 (2020)).

As an initial point, *Alabama Association of Realtors* and *Tiger Lily* do not control this case. Those cases concerned a different agency, the CDC, and a different regulation, the suspension of evictions. Any authority to issue such regulation came from a different statute: the PHSA. The decisions primarily focused on interpreting the language of that underlying statute. *Ala Ass'n of Realtors*, 141 S. Ct. at 2488; *Tiger Lily*, 5 F.4th at 669–71.

Those cases are inapposite because here the statutory language unambiguously grants OSHA authority for the ETS. As discussed at length, the OSH Act confers authority on OSHA to impose standards and regulations on employers to protect workplace health and safety, including the transmission of viruses in the workplace. *See* 29 U.S.C. §§ 651(b), 655(c). OSHA's ETS authority is circumscribed not only by the requirements of grave danger and necessity, but also by the required relationship to the workplace. *Id.; see United Steelworkers of Am.*, 647 F.2d at 1230. And OSHA honored those parameters, issuing emergency standards only eleven times, including the currently challenged ETS. *See* Scott D. Szymendra, Cong. Rsch.

SERV., R46288, OCCUPATION SAFETY AND HEALTH ADMIN. (OSHA): COVID-19 EMERGENCY TEMPORARY STANDARDS (ETS) ON HEALTH CARE EMP. AND VACCINATIONS AND TESTING FOR LARGE EMPS. at 35–36 tbl. A-1 (2021), https://crsreports.congress.gov/product/pdf/R/R46288. This is, therefore, different from the CDC's authority under the PHSA, which provided a limited scope of tools to effectuate the Act's purposes, which scope did not include moratoria, and which regulated an area not traditionally in the CDC's wheelhouse.[1]   Finally, the same federalism concerns are not at issue here:  "[a]lthough . . . 'public health issues' . . . have 'traditionally been a primary concern of state and local officials,' Congress, in adopting the OSH Act, decided that the federal government would take the lead in regulating the field of occupational health." *Farmworker Just. Fund v. Brock*, 811 F.2d 613, 625 (D.C. Cir. 1987) (quoting *Am. Textile Mfrs. Inst.*, 452 U.S. at 509).

In sum, the major questions doctrine is inapplicable here.  OSHA's issuance of the ETS is not a transformative expansion of its regulatory power as OSHA has regulated workplace health and safety, including diseases, for decades.

### 3.  OSHA's Basis for the Emergency Temporary Standard

Having found no threshold issue that OSHA exceeded its authority under the statute, we turn to the challenges to the ETS itself.

As noted, OSHA is permitted to issue an emergency temporary standard, which takes "immediate effect" and serves as a "proposed rule" for a notice-and-comment rulemaking if it determines:  (1) "that employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from new hazards," and (2) that a standard "is necessary to protect employees from such danger."  29 U.S.C. § 655(c).  Those determinations are "conclusive if supported by substantial evidence in the record as a whole."

---

[1] In comparing this case with *Alabama Association*, the Fifth Circuit wrote, "But health agencies do not make housing policy, and occupational safety administrators do not make health policy."  *BST Holdings*, 17 F.4th at 619.  The Fifth Circuit fails to acknowledge that OSHA stands for the Occupational Safety and *Health* Administration.  *See* 29 U.S.C. § 651(b) ("The Congress declares it to be its purpose and policy . . . to assure so far as possible every working man and woman in the Nation safe and *healthful* working conditions . . . ." (emphasis added)).

*Id.* § 655(f). On judicial review, we determine "whether the record contains 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Asbestos Info. Ass'n*, 727 F.2d at 421 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

While the ultimate question hinges on whether the record contains substantial evidence, "the nature of the evidence in this case requires that we inquire into whether OSHA 'carried out [its] essentially legislative task in a manner reasonable under the state of the record before [it].'" *Id.* at 421 (quoting *Aqua Slide 'n' Dive Corp. v. Consumer Prod. Safety Comm'n*, 569 F.2d 831, 838 (5th Cir. 1978)). To this end, deference is given to OSHA's fact-finding expertise. *Id.* (citing *Aqua Slide 'n' Dive Corp.*, 569 F.2d at 838). While "we must take a 'harder look' at OSHA's action than we would if we were reviewing the action under the more deferential arbitrary and capricious standard," *id.* at 421, by the very nature of the administrative proceeding, some flexibility is to be exercised in judicial review, *id.* at 422.

The court "can review [the] data in the record and determine whether it reflects substantial support for the Secretary's findings." *Indus. Union Dep't, AFL-CIO v. Hodgson*, 499 F.2d 467, 475 (D.C. Cir. 1974) (recognizing that substantial evidence standard of review in a legislative-type proceeding is only applicable to some dimensions of the agency's decision). But some "determinations involve policy choices or factual determinations so much 'on the frontiers of scientific knowledge' that they resemble policy determinations more than factual ones." *Asbestos Info. Ass'n*, 727 F.2d at 422 (quoting *Hodgson*, 499 F.2d at 474). For these determinations we respect "'the boundaries between the legislative and the judicial function,' [and] we 'approach our reviewing task with a flexibility informed and shaped by sensitivity to the diverse origins of the determinations that enter into a legislative judgment' made by an agency." *Id.* (quoting *Hodgson*, 499 F.2d at 475). So too here.

In assessing the likelihood of success of the ETS challenges, we rely on the extensive preamble to the ETS and the record before the courts.

### i. Emergency

We begin with the contention endorsed by the Fifth Circuit that the standard automatically fails because OSHA did not issue the ETS at the outset of the pandemic. The claim that COVID-19 does not present "a true emergency" in the workplace has no foundation in the record and law and ignores OSHA's explanations. OSHA addressed COVID-19 in progressive steps tailored to the stage of the pandemic, including consideration of the growing and changing virus, the nature of the industries and workplaces involved, and the availability of effective tools to address the virus. This reasoned policy determination does not undermine the state of emergency that this unprecedented pandemic currently presents.

Even if we assume that OSHA should have issued an ETS earlier, moreover, "to hold that because OSHA did not act previously it cannot do so now only compounds the consequences of the Agency's failure to act." *Id.* at 423. In *Asbestos Information Association*, the petitioners challenged the Agency's motives in promulgating an ETS "when the Agency has known for years that asbestos constitutes a serious health risk, and, in fact, has had all the data it uses to support its . . . action at hand, but nevertheless failed to act on it." *Id.* The Fifth Circuit concluded that the statutory language itself precludes a requirement that OSHA may only act on "new information" because the Act permits regulation of harmful agents *or* "new hazards," proving that not all regulated dangers must be new. *Id.* "OSHA should, of course, offer some explanation for its timing in promulgating an ETS," *id.*, and OSHA has done so here.

The record establishes that COVID-19 has continued to spread, mutate, kill, and block the safe return of American workers to their jobs. To protect workers, OSHA can and must be able to respond to dangers as they evolve. As OSHA concluded: with more employees returning to the workplace, the "rapid rise to predominance of the Delta variant" meant "increases in infectiousness and transmission" and "potentially more severe health effects." 86 Fed. Reg. at 61,409–12. OSHA also explained that its traditional nonregulatory options had been proven "inadequate." *Id.* at 61,444. OSHA acted within its discretion in making the practical decision to wait for Federal Drug Administration (FDA) approval of the vaccines before issuing the ETS; "this fact demonstrates appropriate caution and thought on the part of the Secretary."

*Florida*, 2021 WL 5768796, at \*14 n.2.  These findings, therefore, coupled with FDA-approved vaccines, more widespread testing capabilities, the recognized Delta variant and the possibility of new variants[2] support OSHA's conclusion that the current situation is an emergency, and one that can be ameliorated by agency action.

### ii.  Grave Danger

Health effects may constitute a "grave danger" under the OSH Act if workers face "the danger of incurable, permanent, or fatal consequences . . . , as opposed to easily curable and fleeting effects on their health."  *Fla. Peach Growers Ass'n, Inc. v. U.S. Dep't of Labor*, 489 F.2d 120, 132 (5th Cir. 1974).  The "grave danger" required to warrant an ETS is a risk greater than the "significant risk" that OSHA must show to promulgate a permanent standard under § 655(b) of the Act.  *See Indus. Union Dep't*, 448 U.S. at 640 n.45.  But the ultimate determination of what precise level of risk constitutes a "grave danger" is a "policy consideration that belongs, in the first instance, to the Agency."  *Asbestos Info. Ass'n*, 727 F.2d at 425 (accepting OSHA's determination that 80 lives at risk over six months was a grave danger).

The Fifth Circuit's conclusion, unadorned by precedent, that OSHA is "required to make findings of exposure—or at least the presence of COVID-19—in *all* covered workplaces" is simply wrong.  *BST Holdings*, 17 F.4th at 613 (emphasis in original).  If that were true, no hazard could ever rise to the level of "grave danger" because a risk cannot exist equally in every workplace and so the entire provision would be meaningless.  Almost fifty years ago, the Third Circuit quickly dismantled this argument:

> Industry petitioners argue that there must also be substantial evidence to support OSHA's determination that employees are *in fact* being exposed to those harmful substances.  Although subsection 6(c)(1) readily lends itself to such a reading, that interpretation would render ineffective the provision for emergency temporary standards.  The purpose of subsection 6(c)(1) is to provide immediate protection in cases where there is a grave danger of harm to employees.  This necessarily requires rather sweeping regulation.  OSHA cannot be expected to conduct on-the-spot investigations of every user to determine if exposure is occurring.

---

[2]This possibility has borne out with the Omicron variant.

In cases where OSHA determines that a substance is sufficiently harmful that a grave danger *would* be created by exposure, OSHA must be allowed to issue necessary regulations. In other words exposure can be assumed to be occurring at any place where there is a substance that has been determined to be sufficiently harmful to pose a grave danger and where the regulations that have been determined to be necessary to meet that danger are not in effect. This interpretation of subsection 6(c)(1) is supported by the existence of subsection 6(d), which provides that any affected employer may obtain a variance from any standard if he can show that "the conditions, practices, means, methods, operations, or processes used or proposed to be used by an employer will provide employment and places of employment to his employees which are as safe and healthful as those which would prevail if he complied with the standard."

*Dry Color Mfrs. Ass'n v. Dep't of Labor*, 486 F.2d 98, 102 n.3 (3d Cir. 1973) (emphasis added). Thus, OSHA is not required to investigate every business to show that COVID-19 is present in each workplace nor is it required to prove that every worker will experience the same risk of harm.[3]

On this point, OSHA has demonstrated the pervasive danger that COVID-19 poses to workers—unvaccinated workers in particular—in their workplaces. First, OSHA explains why the mechanics of COVID-19 transmission make our traditional workplaces ripe for the spread of the disease, putting workers at heightened risk of contracting it. Transmission can occur "when people are in close contact with one another in indoor spaces (within approximately six feet for at least fifteen minutes)" or "in indoor spaces without adequate ventilation where small respiratory particles are able to remain suspended in the air and accumulate." 86 Fed. Reg. at 61,409. Transmissibility is possible from those who are symptomatic, asymptomatic, or pre-symptomatic, and variants are likely to be more transmissible. *Id.* American workplaces often require employees to work in close proximity—whether in office cubicles or shoulder-to-shoulder in a meatpacking plant—and employees generally "share common areas like hallways, restrooms, lunchrooms[,] and meeting rooms." *Id.* at 61,411. Evidence cited by OSHA

---

[3]Our dissenting colleague argues that OSHA fails to satisfy the "grave danger" in the workplace limitation on its authority because it does not establish that "all covered employees have a high risk both of contracting COVID-19 and suffering severe consequences." (Dissent Op. at 49) But this section on "*Grave Danger*" explains that OSHA is not required to show the presence of COVID-19 in *every* workplace industry by industry nor that *every* employee will be harmed in the same serious way by it. *Am. Dental Ass'n*, 984 F.2d at 827 (holding that OSHA is not required to proceed "workplace by workplace").

corroborates its conclusion: scientific studies and findings prescribed by the CDC show that the nature of the disease itself provides significant cause for concern in the workplace. *Id.* (citing studies).

OSHA relied on public health data to support its observations that workplaces have a heightened risk of exposure to the dangers of COVID-19 transmission. Many empirical, peer-reviewed studies cited by OSHA have found that because of the characteristics of our workplace, "most employees who work in the presence of other people (e.g., coworkers, customers, visitors) need to be protected." 86 Fed. Reg. at 61,412. Reports produced by state public health organizations corroborate that finding. *See, e.g.*, *id.* at 61,413 (North Carolina Department of Health and Human Services reporting that "number of cases associated with workplace clusters began increasing in several different types of work settings, including meat processing, manufacturing, retail, restaurants, childcare, schools, and higher education."); *id.* (Colorado Department of Public Health & Environment reporting similar outbreaks across many types of industries.); *id.* (Louisiana Department of Health, reporting that "[m]ore than three quarters of outbreaks through [August 24, 2021] were associated with workplaces.").[4]

Having established the risk to covered employees in the workplace, OSHA also set out evidence of the severity of the harm from COVID-19. Apart from death, COVID-19 can lead to "serious illness, including long-lasting effects on health," (now named "long COVID"). *Id.* at 61,410. It has also "killed over 725,000 people in the United States in less than two years." *Id.* at 61,402. The number of deaths in America has now topped 800,000 and healthcare systems across the nation have reached the breaking point. COVID-19 affects individuals of all age groups; but on the whole "working age Americans (18-64 years old) now have a 1 in 14 chance of hospitalization when infected with COVID-19." *Id.* at 61,410. The "severity is also likely exacerbated by long-standing healthcare inequities experienced by members of many racial and

---

[4]Our dissenting colleague argues that OSHA fails to satisfy the grave danger "in the workplace" limitation on its authority because the Secretary did not specify how many employees would contract the virus at work and instead "calculated the number of people *who happen to work* who would, in any event, contract COVID-19." (Dissent Op. at 51) As shown in this section, however, OSHA presented substantial evidence both that the workplaces of virtually every industry across America present a heightened risk of COVID-19 exposure to employees and that a clear predominance of COVID-19 outbreaks come from workplaces.

economic demographics." *Id.* Compounding matters, mutations of the virus become increasingly likely with every transmission, contributing to uncertainty and greater potential for serious health effects. *Id.* at 61,409. Based on this record, the symptoms of exposure are therefore neither "easily curable and fleeting" nor is the risk of developing serious disease speculative. *See Fla. Peach Growers*, 489 F.2d at 132; *Dry Color Mfrs. Ass'n*, 489 F.2d at 106.

OSHA further estimated that the standard would "save over 6,500 worker lives and prevent over 250,000 hospitalizations over the course of the next six months." *Id.* at 61,408. This well exceeds what the Fifth Circuit previously found to present a grave danger. *See Asbestos Info. Ass'n*, 727 F.2d at 424 (assuming that 80 deaths over six months would constitute a grave danger). As the death rate in America has continued to climb throughout 2021, those estimates may prove to be understated. Bill Chappell, *800,000 Americans Have Died of COVID. Now the U.S. Braces for an Omicron-Fueled Spike*, NPR (Dec. 14, 2021), https://www.npr.org/sections/coronavirus-live-updates/2021/12/14/1063802370/america-us-covid-death-toll. And where grave danger exists in a workplace, of course OSHA may consider the statistical proof on lives saved and hospitalizations prevented when issuing an ETS, even if the risk to individual workers varies within workplaces.

A few Petitioners attack the veracity of some of the studies on which OSHA relies in its ETS or point to other studies that they claim contradict the studies on which OSHA relied. But the court's "expertise does not lie in technical matters." *Pub. Citizen Health Rsch. Grp. v. Tyson*, 796 F.2d 1479, 1495 (D.C. Cir. 1986). "[I]t is not infrequent that the available data do not settle a regulatory issue, and the agency must then exercise its judgment in moving from facts and probabilities on the record to a policy conclusion." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)). OSHA pointed to extensive scientific evidence, including studies conducted by the CDC, of the dangers posed by COVID-19. We therefore cannot say that OSHA acted improperly in light of its clear reliance on "a body of reputable scientific thought." *Indus. Union Dep't.*, 448 U.S. at 656.

The claim that COVID-19 exists outside the workplace and thus is not a grave danger in the workplace is equally unavailing. As discussed above, OSHA routinely regulates hazards that

exist both inside and outside the workplace. More to the point, OSHA here demonstrated with substantial evidence that the nature of the workplace—commonplace across the country and in virtually every industry—presents a heightened risk of exposure. Union Petitioners illustrate this point as well. Within one week in mid-November, Michigan had reported 162 COVID-19 outbreaks, 157 of which were in workplaces;[5] Tennessee reported 280 COVID-19 outbreaks, 161 of which were in workplaces;[6] Washington state reported 65 outbreaks, of which 58 were in workplaces.[7] And other states similarly experienced outbreaks predominantly in the workplace.[8] COVID-19 is clearly a danger that exists in the workplace.

Some Petitioners contend that COVID-19 is no longer a grave danger and claim that OSHA's delay in promulgating the ETS is evidence that no grave danger exists. As explained, however, OSHA provided its reasoning for the delay. When the pandemic began, "scientific evidence about the disease" and "ways to mitigate it were undeveloped." 86 Fed. Reg. at 61,429. At that point, OSHA chose to focus on nonregulatory options, and crafted workplace guidance "based on the conditions and information available to the agency at that time," including that "vaccines were not yet available." *Id.* at 61,429–30. The voluntary guidance, however, proved inadequate, and as employees returned to workplaces the "rapid rise to predominance of the Delta variant" meant "increases in infectiousness and transmission" and "potentially more severe health effects." *Id.* at 61,409–12.

At the same time, the options available to combat COVID-19 changed significantly: the FDA granted approval to one vaccine on August 23, 2021, and testing became more readily available. *Id.* at 61,431, 61,452. These changes, coupled with the ongoing risk workers face of

---

[5]Mich. Dep't of Health & Human Servs., https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173_ 102057---,00.html.

[6]TN Dep't of Health, https://www.tn.gov/content/dam/tn/health/documents/cedep/novel-coronavirus/Critical IndicatorReport.pdf

[7]Wash. Dep't of Health, https://www.doh.wa.gov/Portals/1/Documents/1600/coronavirus/data-tables/Statewide COVID-19 OutbreakReport.pdf.

[8]Union Petitioners point to California, New Mexico, and Oregon as other states that illustrate significant outbreaks in a variety of workplaces.

contracting COVID-19, support OSHA's conclusion that the time was ripe for OSHA to address the ongoing danger in the workplace through an ETS. More importantly, we are not to second guess what the Agency considers a "risk worthy of Agency action" because that "is a policy consideration that belongs, in the first instance to the Agency." *Asbestos Info. Ass'n*, 727 F.2d at 425. Relying on the history of the pandemic, OSHA explained that "the agency cannot assume based on past experience that nationwide case levels will not increase again." 96 Fed. Reg. at 61,431. That conclusion has proven correct, as we now see the rise of new and more transmissible variants and the resulting increases in COVID-19 cases. *See* Centers for Disease Control and Prevention (CDC), *Omicron Variant: What You Need to Know* (Dec. 13, 2021), https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html. And we know that in our nation, over 800,000 people have died in less than two years and the numbers continue to climb, with more of those deaths having occurred in 2021 than in 2020. *See* Bill Chappell, *supra*.

Based on the wealth of information in the 153-page preamble, it is difficult to imagine what more OSHA could do or rely on to justify its finding that workers face a grave danger in the workplace. It is not appropriate to second-guess that agency determination considering the substantial evidence, including many peer-reviewed scientific studies, on which it relied. Indeed, OSHA need not demonstrate scientific certainty. As long as it supports it conclusion with "a body of reputable scientific thought," OSHA may "use conservative assumptions in interpreting the data . . . , risking error on the side of overprotection rather than underprotection." *Indus. Union Dep't*, 448 U.S. at 656.

### iii. Necessity

To issue an ETS, OSHA is also required to show that the ETS is "necessary to protect employees from" the grave danger. 29 U.S.C. § 655(c)(1). This standard is more demanding than the "reasonably necessary or appropriate" standard applicable to permanent standards. *See id.* § 652(8); *see also Indus. Union Dep't*, 448 U.S. at 615. To pass muster, OSHA must demonstrate, by substantial evidence, that the regulation is essential to reducing the grave danger asserted. *See Dry Color*, 486 F.2d at 105. In addition, OSHA must address economic feasibility

because the ETS's "protection afforded to workers should outweigh the economic consequences to the regulated industry." *Asbestos Info. Ass'n*, 727 F.2d at 423.

Some Petitioners argue the word "necessity" mandates that OSHA's standard may use only the means that are absolutely required to quell the grave danger. Taken seriously, such a cramped reading of the statute would require OSHA to prognosticate an emergency and devise the most narrowly tailored ETS to entirely remove the grave danger from the workplace. But in virtually every emergency situation that would require an ETS, no precaution proposed by OSHA could ever be 100 percent effective at quelling the emergency. Courts have acknowledged this practical reality, explaining that ETS standards "may necessarily be somewhat general . . . . It cannot be expected that every procedure or practice will be strictly necessary as to every substance, type of use, or plant operation." *Dry Color Mfrs. Ass'n, Inc.*, 486 F.2d at 105. OSHA need only demonstrate that the solution it proposes "is necessary to *alleviate* a grave risk of worker deaths during [the ETS's] six month term." *Asbestos Info. Ass'n*, 727 F.2d at 427 (emphasis added).

The dissent disagrees, contending that the Secretary must rule out alternatives to show why his proposed means are "indispensable," pointing us to *Asbestos Information Association*. (Dissent Op. at 44) But in that case, the Fifth Circuit found that OSHA's determination of necessity for the proposed ETS was undercut by its existing regulation through which "much of the claimed benefit could be obtained." 727 F.2d at 427. The Fifth Circuit did not require that OSHA rule out every plausible alternative in devising its ETS because the critical question was whether OSHA's current regulations were sufficient to address the problem. *See id.* To answer that question, the Secretary here cataloged OSHA's actions involving COVID-19, starting with advisory guidance then moving to attempts to enforce its General Duty clause. 86 Fed. Reg. at 61,444. These actions were to no avail as COVID-19 transmission rates in the workplace continued to climb and COVID-19-related complaints continued to pour in, suggesting "a lack of widespread compliance." *Id.* at 61,445. With nothing left at his disposal to curb the transmission in the workplace, the Secretary issued the ETS. We find that this explanation satisfies the Secretary's obligation.

Turning to assess the remaining evidence supporting OSHA's necessity finding, OSHA explained that the pandemic in the United States has significantly changed course since the emergence of COVID-19 in early 2020, necessitating an ETS at this point in time. In particular, the emergence of the Delta variant significantly increased transmission when reported cases had been dwindling for months. The realities of the Delta variant significantly changed public health policy and underscored a need for issuing an ETS—not only to control the variant itself, but to control the spread of the disease to slow further mutations. 86 Fed. Reg. at 61,431–32. Recognizing this new reality, the Agency crafted an ETS with options for employers, noting that "employers in their unique workplace settings may be best situated to understand their workforce and strategies that will maximize worker protection while minimizing workplace disruptions." *Id.* at 61,436.

Regarding the vaccine component of the ETS, OSHA explained the importance of vaccination to combat the transmission of COVID-19 and relied upon studies demonstrating the "power of vaccines to safely protect individuals," including from the Delta variant. *Id.* at 61,432, 61,450. Extensive evidence cited by OSHA shows that vaccination "reduce[s] the presence and severity of COVID-19 cases in the workplace," and effectively "ensur[es]" that workers are protected from being infected and infecting others. *Id.* at 61,434, 61,520, 61,528–29 (citing studies). Likewise, the face-covering-and-test facet of the ETS is similarly designed based on the scientific evidence to reduce the risk of transmission and infection of COVID-19. Regular testing "is essential because SARS-CoV-2 infection is often attributable to asymptomatic or pre-symptomatic transmission." *Id.* at 61,438 (citing studies). And wearing a face covering provides an additional layer of protection, designed to reduce "exposure to the respiratory droplets of co-workers and others[, and] . . . to significantly reduce the wearer's ability to spread the virus." *Id.* at 61,439.

Vaccinated employees are significantly less likely to bring (or if infected, spread) the virus into the workplace. *Id.* 61,418–19. And testing in conjunction with wearing a face covering "will further mitigate the potential for unvaccinated workers to spread the virus at the workplace." *Id.* at 61,439. Based on the evidence relied on by OSHA, these measures will

"protect workers" from the grave dangers presented by COVID-19 in the workplace. *See* 29 U.S.C. § 655(c)(1). And OSHA is required to minimize a grave danger, even if it cannot eliminate it altogether. *Nat'l Grain & Feed Ass'n v. Occupational Safety & Health Admin.*, 866 F.2d 717, 737 (5th Cir. 1988).

OSHA limited the ETS to coverage of 100 or more employees, based on four reasons. First, as a practical matter, those employers have the administrative and managerial capacity to be able to promptly implement and meet the standard. *Id.* at 61,511. Second, the coverage threshold is sufficiently expansive to ensure protection to meaningfully curb transmission rates to offset the impact of the virus. *Id.* Third, the ETS "will reach the largest facilities, where the most deadly outbreaks of COVID-19 can occur." *Id.* And finally, the standard is consistent with size thresholds established in analogous congressional and agency decisions, including standards promulgated by the Equal Employment Opportunity Commission under Title VII of the Civil Rights Act of 1964, requirements under the Affordable Care Act (in allowing greater flexibility with its requirements for employers with 100 or fewer employees), and requirements under the Family Medical Leave Act (exempting compliance for employers with fewer than 50 employees given decreased administrative capacity and inability to easily accommodate such employee absences). *Id.* at 61,513.

Petitioners contend, relying on the Fifth Circuit's decision, that the necessity of the ETS is undermined by the fact that it is both "overinclusive" and "underinclusive." Neither observation warrants a stay. OSHA may lean "on the side of overprotection rather than underprotection" when promulgating an ETS. *Indus. Union Dep't*, 448 U.S. at 656.[9] And OSHA is not required to proceed "workplace by workplace," *Am. Dental Ass'n*, 984 F.2d at 827, in its ETS nor would it "be expected to conduct on-the-spot investigations," *Dry Color Mfrs. Ass'n Inc.*, 486 F.2d at 102 n.3. To expect otherwise of OSHA would belie the whole point of an

---

[9]The dissent contends that our citation is inapposite because it "did not review an emergency standard" and refers to the Secretary's interpretation of data underlying a risk assessment. (Dissent Op. at 47) The language cited, however, addresses whether OSHA's evidence supporting its estimation of a risk, which was the basis for the standard, was supported by substantial evidence. *Indus. Union Dep't*, 448 U.S. at 656. Critically, the substantial evidence standard at issue there governs *both* emergency temporary standards and run-of-the-mill OSHA standards and is applicable here. *See* 29 U.S.C. § 655(f).

*emergency* temporary standard, which demands that OSHA act quickly "to provide immediate protection" to workers facing a grave danger. *Id.* at 105. OSHA explored the dangers in varied workplaces and industries and concluded that "employees can be exposed to the virus in almost any work setting" and that employees routinely "share common areas like hallways, restrooms, lunchrooms[,] and meeting rooms" and are at risk of infection from "contact with coworkers, clients, or members of the public." 86 Fed. Reg. at 61,411–12. OSHA supported those conclusions by relying on peer-reviewed studies and data collected by government health departments. But in any case, OSHA tailored the ETS by excluding workplaces where the risk is significantly lower, including those where employees are working exclusively outdoors, remotely from home, or where the employee does not work near any other individuals. *Id.* at 61,516.

The argument that the ETS is overinclusive because it imposes requirements on some workers that are at lesser risk of death than others overlooks OSHA's reasoning. OSHA promulgated the ETS to prevent employees from transmitting the virus to other employees—that risk is not age-dependent. *See, e.g.*, *id.* at 61,403; 61,418–19; 61,435; 61,438. OSHA found that unvaccinated workers in workplaces where they encountered other workers or customers faced a grave danger and that vaccination or testing and masking were necessary to protect those workers from COVID-19. Those workers are in "a wide variety of work settings across all industries" thus counseling for the broad standard. *Id.* at 61,411–12.

That the ETS is underinclusive, as some Petitioners argue, suggests that OSHA has not done enough to eliminate the grave danger facing workers, and more workplace safeguards—not fewer—are needed to protect the workplace. And OSHA explained that it chose a tailored threshold because those employers would be best positioned to actually effectuate the standard and their employees are more at risk. *Id.* at 61,513 ("OSHA has set the threshold for coverage based primarily on administrative capacity for purposes of protecting workers as quickly as possible."); *id.* at 61,512 (suggesting that "larger employers are more likely to have many employees gathered in the same location" and have "larger" and "longer" outbreaks).

OSHA also demonstrates that selecting larger employers means that the ETS reaches enough workers to make a meaningful difference in mitigating the risk. *Id.* at 61,513.

It has long been the case that an agency "is not required to identify the optimal threshold with pinpoint precision. It is only required to identify the standard and explain its relationship to the underlying regulatory concerns." *Nat'l Shooting Sports Found. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (quoting *WorldCom, Inc. v. FCC*, 238 F.3d 449, 461–62 (D.C. Cir. 2001)); *see also Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1191 (9th Cir. 2010); *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015) (noting that the government "need not address all aspects of a problem in one fell swoop"). Courts are "generally unwilling to review line-drawing performed by the [agency] unless a petitioner can demonstrate that lines drawn . . . are patently unreasonable, having no relationship to the underlying regulatory problem." *Cassel v. FCC*, 154 F.3d 478, 485 (D.C. Cir. 1998) (alteration in original) (quoting *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 60 (D.C. Cir. 1977)). OSHA's ETS readily shows a relationship to the underlying regulatory problem—larger employers are better able to implement the policies, are at heightened risk, and regulating them will be a significant step in protecting the entire workforce from COVID-19 transmission. And of course, agencies can later revise, refine, and broaden (or narrow) their regulations, but exigent circumstances allow there to be some reasonable discretion at the initial steps of promulgating a regulation. *See Forging Indus. Ass'n*, 773 F.2d at 1454; *United Steelworkers of Am.*, 647 F.2d at 1309–10 (D.C. Cir. 1980).

Turning to the cost analysis, OSHA is not required to conduct a "formal cost-benefit analysis" before issuing an ETS. *Asbestos Info. Ass'n*, 727 F.2d at 423 n.18 (reasoning that it is "unlikely" that "the agency would have time to conduct such an analysis" in the context of an emergency). Congress recognized that OSHA standards would impose costs, but placed "the benefit of worker health above all other considerations save those making attainment of this benefit unachievable." *Am. Textile Mfrs. Inst.*, 452 U.S. at 509. The question is whether the standard is economically feasible. *United Steelworkers of Am.*, 647 F.2d at 1264. An OSHA "standard is economically feasible if the costs it imposes do not 'threaten massive dislocation to, or imperil the existence of, the industry.'" *Am. Iron & Steel Inst. v. Occupational Safety*

*& Health Admin.*, 939 F.2d 975, 980 (D.C. Cir. 1991) (quoting *United Steelworkers of Am.*, 647 F.2d at 1265). OSHA must consider the costs in relation to the financial health of the affected industries or their impact on consumer prices. *United Steelworkers of Am.*, 647 F.2d at 1265.

Here, OSHA conducted a detailed economic analysis, concluding that the costs amounted to approximately 0.02 percent of the revenue of the average covered employer, or about $11,298 per affected entity. 86 Fed. Reg. at 61,493–94. "To put this into perspective, if the average firm decided to raise prices to cover the costs of the ETS, the price of a $100 product or service, for example, would have to be increased by 2 cents (during the six-month period)." *Id.* at 61,499. These costs are modest in comparison to other standards OSHA has implemented. *See, e.g.*, *United Steelworkers of Am.*, 647 F.2d at 1281 (estimating capital costs for primary lead smelters to comply with OSHA's lead exposure standard to be between $32 million and $47 million). OSHA's analysis, moreover, does not consider the economic harm a business will undergo if it is closed by a COVID-19 outbreak in its workplace—taking this into account would further show that the benefits will outweigh the costs of the ETS. If the costs of implementation become too high for a single business, an employer can raise infeasibility or impossibility as a defense to any citation that OSHA may issue for violating the ETS. 29 C.F.R. § 2200.34(b)(3).

Based on the substantial evidence referenced and relied upon by OSHA, there is little likelihood of success for the challenges against OSHA's bases for issuing the ETS.

### 4. Constitutional Challenges

We turn to the likelihood of success on the remaining constitutional arguments raised by the Petitioners and were presumed persuasive by the Fifth Circuit.[10]

---

[10]Some Petitioners raise challenges regarding religious liberty. The ETS states, "if the vaccination, and/or testing for COVID-19, and/or wearing a face covering conflicts with a sincerely held religious belief, practice or observance, a worker may be entitled to a reasonable accommodation." 86 Fed. Reg. at 61,522. Therefore, Petitioners are unlikely to succeed on their argument that the ETS infringes on religious liberty. Regardless, their circumstance-specific arguments are premature and do not provide a basis to stay the entire ETS.

### i. Commerce Clause

First, Petitioners raise challenges to the ETS under the Commerce Clause, directing us to the Fifth Circuit's conclusion that the ETS "likely exceeds the federal government's authority under the Commerce Clause because it regulates noneconomic inactivity that falls squarely within the States' police power." *BST Holdings*, 17 F.4th at 617. Relying on *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 522 (2012), the Fifth Circuit reasoned that "[a] person's choice to remain unvaccinated and forego regular testing is noneconomic activity," and falls within the States' police power. *Id.* On that basis, the stay opinion summarily concluded that because the ETS "commandeers" employers to compel activity that falls within the States' police power, it "far exceed[s] current constitutional authority." *Id.*

Petitioners and the Fifth Circuit miss the mark. The ETS regulates employers with more than 100 employees, not individuals. It is indisputable that those employers are engaged in commercial activity that Congress has the power to regulate when hiring employees, producing, selling and buying goods, etc. *See NFIB*, 567 U.S. at 550 ("The power to *regulate* commerce presupposes the existence of commercial activity to be regulated."). The ETS regulates economic activity by regulating employers.

It has long been understood that regulating employers is within Congress's reach under the Commerce Clause. To hold otherwise would upend nearly a century of precedent upholding laws that regulate employers to effectuate a myriad of employee workplace policies. *See, e.g.*, *United States v. Darby*, 312 U.S. 100, 109, 114 (1941) (finding the Fair Labor Standards Act imposed a permissible use of government power when it set a minimum wage standard to prevent the production of goods "for interstate commerce, under conditions detrimental to the maintenance of the minimum standards of living necessary for health and general well-being"); *United Steelworkers of Am., AFL-CIO v. Weber*, 443 U.S. 193, 206 n.6 (1979) (finding proper use of the commerce power to bar employers from discriminating against employees on a protected ground under Title VII); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33 (1937) (finding proper use of commerce power to safeguard "the right of employees to self-organization

and to select representatives of their own choosing for collective bargaining or other mutual protection without restraint or coercion by their employer"). These cases recognize, for example, that, a person's choice to discriminate against another based on race is "noneconomic activity," but the effect of that choice on the workplace and the flow of commerce in and from that workplace is economic—hence, it is subject to regulation under the Commerce Clause. *Cf. Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 253 (1964) (finding "discrimination by hotels and motels impedes interstate travel").

That principle was at the heart of the Supreme Court's decision in *NLRB v. Jones & Laughlin Steel*, 201 U.S. 1 (1927). There, the Court emphasized that to determine the Commerce Clause's applicability, we focus on the "effect upon commerce, not the source of the injury," 301 U.S. at 32, and that Congress may legislate under the Commerce Clause to ensure the safety of commerce, *id.* at 37. When industries occupy a "national scale," moreover, Congress may protect interstate commerce from "paraly[sis]." *Id.* at 41. COVID-19's paralyzing effect on commerce has been repeatedly demonstrated throughout the pandemic. *See, e.g.*, U.S. Bureau of Labor Statistics, TED: The Economics Daily (July 8, 2021), https://www.bls.gov/opub/ted/2021/6-2-million-unable-to-work-because-employer-closed-or-lost-business-due-to-the-pandemic-june-20 21.htm.

This also demonstrates why *NFIB v. Sebelius* is inapposite. In *NFIB*, the Supreme Court considered challenges to the Affordable Care Act's individual mandate. 567 U.S. at 539. Critically, and fatal to the Fifth Circuit's point, the Affordable Care Act contains two separate types of mandates: the individual mandate to direct individuals to purchase health insurance—at issue in *NFIB*—and the employer mandate—not at issue in *NFIB*. *See* 26 U.S.C. § 4980H. A plurality of five Justices questioned whether the Commerce Clause gave Congress the power to mandate that people engage in economic activity to sustain the *individual* mandate. *See NFIB*, 567 U.S. at 547–58. But no Justice doubted that Congress could, under the Commerce Clause, require *employers* to provide health insurance to their employees. So too here.

Citing *Zucht v. King*, 260 U.S. 174 (1922), and *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), Petitioners and the Fifth Circuit contend that the ETS "falls squarely within the States'

police powers." *BST Holdings*, 17 F.4th at 617. But those cases concerned challenges to state vaccine requirements under the Fourteenth Amendment, not federalism questions over whether states or the federal government can impose such a requirement. If the suggestion here is that the federal and state regulatory powers over economic activity are mutually exclusive, the Supreme Court rejected that argument in *Willson v. Black Bird Creek Marsh Co.*, 27 U.S. 245, 251–52 (1829) (holding an act empowering the State's construction of a dam that obstructed an interstate walkway is not "repugnant to the power to regulate commerce in its dormant state"). To be sure, there are numerous areas—for example, education—in which States and the federal government have overlapping authority. But that states may regulate COVID-19 safety measures does not operate to preclude the federal government from doing so.

Finally, Congress already addressed the issue when it passed the OSH Act, expressing its intention to preempt state and local standards that conflict with OSHA standards. *See Gade*, 505 U.S. at 98–99 (holding that "nonapproved state regulation of occupational safety and health issues for which a federal standard is in effect is impliedly preempted" by OSHA's standard). Hazards are often regulated by both OSHA and state agencies, such as exposure to lead. But overlap does not limit the authority Congress granted to OSHA to regulate the same risk of exposure.

For the foregoing reasons, the Commerce Clause challenges do not have a meaningful likelihood of success.

### ii. Non-Delegation Doctrine

Relying on the Fifth Circuit's decision, Petitioners cast constitutional doubt on the ETS by questioning Congress's delegation of authority to OSHA when it passed the OSH Act. The Fifth Circuit cursorily concluded that Congress cannot "authorize a workplace safety administration in the deep recesses of the federal bureaucracy to make sweeping pronouncement on matters of public health affecting every member of society in the profoundest of ways." *BST Holdings*, 17 F.4th at 611. That contention never specifies which provision of the OSH Act is an

improper delegation. We therefore construe its analysis in line with the Petitioners' arguments that 29 U.S.C. § 655(c)(1) constitutes an improper delegation.

The Supreme Court has only twice invoked the non-delegation doctrine to strike down a statute. *See Panama Refin. Co. v. Ryan*, 293 U.S. 388, 430 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 542 (1935). In *Gundy v. United States*, the Supreme Court stated that, "[t]he nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government." 139 S.Ct. 2116, 2121 (2019) (plurality opinion). "But the Constitution 'does not deny[] to the Congress the necessary resources of flexibility and practicality [that enable it] to perform its function[s]." *Id.* at 2123 (alterations in original) (quoting *Yakus v. United States*, 321 U.S. 414, 425 (1944)) (alterations in original). To the contrary, Congress "may confer substantial discretion on executive agencies to implement and enforce the laws." *Id.* (citing *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). A statutory delegation is therefore constitutional as long as "Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Id.* (quoting *Mistretta*, 488 U.S. at 372) (alterations in original). The starting and often ending point for the analysis is "statutory interpretation": We must "constru[e] the challenged statute to figure out what task it delegates and what instructions it provides" and then "decide whether the law sufficiently guides executive discretion to accord with Article I." *Id.* at 2124.

The Supreme Court has long recognized the power of Congress to delegate broad swaths of authority to executive agencies under this standard and has ultimately concluded that extremely broad standards will pass review. *See id.* at 2129. How broad? Delegations to regulate in the "public interest," *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216 (1943), to set "fair and equitable prices," *Yakus*, 321 U.S. at 427, and to issue air quality standards "requisite to protect the public health," *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472 (2001). *See Gundy*, 139 S. Ct. at 2129 (collecting sources).

Our extensive discussion of the statutory framework of the OSH Act above starts and ends the inquiry. OSHA's statutory authority to issue standards is found in 29 U.S.C. § 655.

Specific authorization is in § 655(c)(1) and requires the Secretary to promulgate "emergency temporary standards," when he determines that employees are in "grave danger" from exposure to a workplace hazard and that the standard is "necessary to protect the employees from such danger." As shown above, it is well-established that the scope of the OSH Act and OSHA's authority include infectious diseases in the workplace, even when those diseases also exist outside the workplace. Therefore, Congress applied an "intelligible principle" when it directly authorized OSHA to exercise this delegated authority in particular circumstances. The Supreme Court long ago recognized this authority: "The [Occupational Safety and Health] Act delegates broad authority to the Secretary to promulgate different kinds of standards." *Indus. Union Dep't*, 448 U.S. at 611.

There is little possibility of success under the non-delegation doctrine.

## C. Irreparable Harm

The foregoing analysis shows that Petitioners cannot establish a likelihood of success on the merits, and this reason alone is sufficient to dissolve the stay. *Nken*, 556 U.S. at 433–34. We also conclude, however, that Petitioners have not shown that any injury from lifting the stay outweighs the injuries to the Government and the public interest.

To merit a stay, Petitioners bear the burden to demonstrate an irreparable injury; "simply showing some 'possibility of irreparable injury' fails to satisfy the second factor." *Nken*, 556 U.S. at 434–35 (quoting *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998)). Moreover, because this case involves the Government as an opposing party, the third and fourth factors "merge." *Id.* at 435. The Fifth Circuit failed to analyze any harm to OSHA, instead baldly concluding that a stay will "do OSHA no harm whatsoever." *BST Holdings*, 17 F.4th at 618. We engage in our own balancing of the parties' harm.

The injuries Petitioners assert are entirely speculative. First, some Petitioners assert that compliance costs will be too high. As detailed in the preceding section, these assertions ignore the economic analysis OSHA conducted that demonstrates the feasibility of implementing the ETS. To the extent that a business with over 100 employees impacted at this stage of the ETS

faces true impossibility of implementation, it can assert that as an affirmative defense in response to a citation. 29 C.F.R. § 2200.34(b)(3). Relying on employee declarations, other Petitioners claim that they will need to fire employees, suspend employees, or face employees who quit over the standard. These concerns fail to address the accommodations, variances, or the option to mask-and-test that the ETS offers. For example, employers that are confident that they can keep their employees safe using alternative measures can seek a variance from the standard pursuant to 29 U.S.C. § 655(d). Or employers may choose to comply with the standard by enforcing the mask-and-test component, which are entirely temporary in nature and do not create irreparable injuries. These provisions of the ETS undercut any claim of irreparable injury.

By contrast, the costs of delaying implementation of the ETS are comparatively high. Fundamentally, the ETS is an important step in curtailing the transmission of a deadly virus that has killed over 800,000 people in the United States, brought our healthcare system to its knees, forced businesses to shut down for months on end, and cost hundreds of thousands of workers their jobs. In a conservative estimate, OSHA finds that the ETS will "save over 6,500 worker lives and prevent over 250,000 hospitalizations" in just six months. 86 Fed. Reg. 61,402, 61,408. A stay would risk compromising these numbers, indisputably a significant injury to the public. The harm to the Government and the public interest outweighs any irreparable injury to the individual Petitioners who may be subject to a vaccination policy, particularly here where Petitioners have not shown a likelihood of success on the merits. *See Coleman v. Paccar*, *Inc.*, 424 U.S. 1301, 1307–08 (1976).

In light of the foregoing, we find that the factors regarding irreparable injury weigh in favor of the Government and the public interest.

### III. CONCLUSION

For the foregoing reasons, we **GRANT** the Government's motion and **DISSOLVE** the stay issued by the Fifth Circuit.

————————————

**CONCURRENCE**

————————————

GIBBONS, Circuit Judge, concurring. I agree that the government's motion to dissolve the stay should be granted and concur fully in Judge Stranch's opinion. I write separately to note the limited role of the judiciary in this dispute about pandemic policy. Petitioners and various opinions discuss at length how OSHA could have handled the pandemic's impact on places of employment differently. Some of the writings include sweeping pronouncements about constitutional law and the scope of OSHA's statutory authority. Much of this writing is untethered from the specific facts and issues presented here and overlooks the limited nature of our role.

Reasonable minds may disagree on OSHA's approach to the pandemic, but we do not substitute our judgment for that of OSHA, which has been tasked by Congress with policy-making responsibilities. *See Charles D. Bonnano Linen Serv., Inc. v. NLRB*, 454 U.S. 404, 418 (1982). This limitation is constitutionally mandated, separating our branch from our political co-branches. "[F]ederal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do." *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 866 (1984). Beyond constitutional limitations, the work of an agency, often scientific and technical in nature, is outside our expertise. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2413 (2019).

Our only responsibility is to determine whether OSHA has likely acted within the bounds of its statutory authority and the Constitution. As it likely has done so, I concur.

---

**DISSENT**

---

LARSEN, Circuit Judge, dissenting.  As the Supreme Court has very recently reminded us, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021).  The majority's theme is that questions of health science and policy lie beyond the judicial ken. I agree.  But this case asks a legal question:  whether Congress authorized the action the agency took.  That question is the bread and butter of federal courts.  And this case can be resolved using ordinary tools of statutory interpretation and bedrock principles of administrative law.  These tell us that petitioners are likely to succeed on the merits, so I would stay OSHA's emergency rule pending final review.

I.

The majority opinion describes the emergency rule at issue here as permitting employers "to determine for themselves how best to minimize the risk of contracting COVID-19 in their workplaces."  Maj. Op. at 7.  With respect, that was the state of federal law *before* the rule, not after.

Here is what the emergency rule does.  It binds nearly all employers with 100 or more employees,[1] and requires them to "establish, implement, and enforce a written mandatory vaccination policy."  29 C.F.R. § 1910.501(b)(1), (d)(1).  It covers all employees, part-time, full-time, and seasonal, except for those who work exclusively from home, outdoors, or alone.  *Id.*

---

[1]The rule exempts employers covered by two different federal rules: the federal contractors and subcontractors already subject to a vaccine mandate and healthcare workers subject to OSHA's June 2021 emergency standard.  29 C.F.R. § 1910.501(b)(2).  The latter rule required healthcare employers to adopt a COVID-19 protection plan and encouraged vaccination but did not impose a vaccinate-or-test mandate.  *Id.* § 1910.502.  In addition, neither "the United States . . . [n]or any State or political subdivision of a State" is a covered "employer."  29 U.S.C. § 652(5).  Several states say that they nonetheless will be forced to comply with the standard because they have adopted their own OSHA plans pursuant to 29 U.S.C. § 667.  Such plans must be "at least as effective in providing safe and healthful employment and places of employment as the standards promulgated under section 655."  *Id.* § 667(c)(2).

§ 1910.501(b)(3). Employees must "be fully vaccinated," unless they qualify for medical or religious exemptions or reasonable accommodations. *Id.* § 1910.501(c). While vaccines are free to the public, employers must provide employees with paid time off both to secure the vaccine and to recover from any side effects. *Id.* § 1910.501(f).

An employer may instead permit unvaccinated employees to undergo weekly COVID-19 testing and wear a mask in the workplace. *Id.* § 1910.501(d)(2), (g)(1), (i)(1). But OSHA consciously designed this exception to be less palatable to employers and employees. The agency expects that employers who adopt a mandatory-vaccination policy will "enjoy advantages," including fewer "administrative burden[s]," than employers who permit the mask-and-test exception. 86 Fed. Reg. at 61,437. And even if an employer elects to take on these additional burdens, it need not absorb the cost of masks and tests, nor provide time off (paid or otherwise) to secure them. *Id.* § 1910.501(d)(2), (g)(1) n.1. This, despite the fact that OSHA's ordinary regulations require employers to pay for agency-mandated equipment, tests, and exams. *See Employer Payment for Personal Protective Equipment*, 72 Fed. Reg. 64,341, 64,342 (Nov. 15, 2007); 86 Fed. Reg. at 61,532 (noting OSHA "has commonly required" employers to pay for protective equipment); 29 C.F.R. § 1910.1030(d)(3)(i), (f)(1)(ii) (Hepatitis B equipment and testing "at no cost"); *id.* § 1910.1018(j)(1), (n)(1)(ii) (same for arsenic); *id.* § 1910.1001(h)(1), (l)(1)(ii)(A) (same for asbestos); *Sec'y of Lab. v. Beverly Healthcare-Hillview*, 541 F.3d 193, 200–01 (3d Cir. 2008) (OSHA's interpretation of "at no cost" includes compensation for testing time and travel expenses). Indeed, OSHA required employers to provide COVID-19 tests "at no cost" to employees under its earlier healthcare ETS. *See* 29 C.F.R. § 1910.502(l)(1)(ii). OSHA was candid about why it deviated from its normal rule: Putting the onus on employees "will provide a financial incentive . . . to be fully vaccinated." 86 Fed. Reg. at 61,437. The rule, in sum, is a mandate to vaccinate or test.

One more background point: The purpose of the mandate is to protect unvaccinated people. *Id.* at 61,419. The rule's premise is that vaccines work. *Id.* And so, OSHA has explained that the rule is not about protecting the vaccinated; they do not face "grave danger" from working with those who are not vaccinated. *Id.* at 61,434.

The various monitoring and reporting duties required by the mandate were to go into effect on December 6, 2021. 29 C.F.R. § 1910.501(m)(2)(i). And employees were required to be fully vaccinated or comply with mask-and-test requirements (if available) by January 4, 2022. *Id.* § 1910.501(m)(2)(ii). The United States Court of Appeals for the Fifth Circuit stayed the enforcement of the vaccinate-or-test mandate. *BST Holdings, LLC v. Occupational Safety & Health Admin.*, 17 F.4th 604 (5th Cir. 2021). After a multi-circuit lottery held pursuant to 28 U.S.C. § 2112(a)(3), this court obtained jurisdiction over all petitions challenging the mandate filed throughout the country. OSHA has now moved to dissolve the stay entered by the Fifth Circuit.[2]

## II.

### A. Likelihood of Success on the Merits

In this case, a multitude of petitioners—individuals, businesses, labor unions, and state governments—have levied serious, and varied, charges against the mandate's legality. They say, for example, that the mandate violates the nondelegation doctrine, the Commerce Clause, and substantive due process; some say that it violates their constitutionally protected religious liberties and the Religious Freedom Restoration Act of 1993. To lift the stay entirely, we would have to conclude that not one of these challenges is likely to succeed. A tall task. To keep the stay, however, there is no need to resolve each of these questions; the stay should remain if we conclude that petitioners are likely to succeed on just one ground. In my view, the petitioners have cleared this much lower bar on even the narrowest ground presented here: The Secretary of Labor lacks statutory authority to issue the mandate. So the most important factor supporting the stay is satisfied. *See Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 992 F.3d 518, 524 (6th Cir. 2021).

---

[2]Petitioners moved for initial en banc hearing, which this court denied. *In re MCP No. 165*, No. 21-7000, 2021 WL 5914024, at *1 (6th Cir. Dec. 15, 2021). I would have granted the petitions regardless of the merits of the case. Given the unique nature of these consolidated proceedings, I thought it preferable to enlist the talents of all sixteen active judges. This panel agreed that the work of the en banc court was separate from the work of this panel and that the orders and opinions from each should issue as soon as they were ready.

1. Statutory Authority

OSHA cannot act without a source of authority. The ordinary way to bring about a rule affecting the people's health and safety is for a state legislature, or sometimes Congress, to pass one into law. Because the legislature "wields the formidable power of 'prescrib[ing] the rules by which the duties and rights of every citizen are to be regulated,'" it is, by design, the branch of government "most responsive to the will of the people." *Tiger Lily, LLC v. U.S. Dep't of Housing & Urb. Dev.*, 5 F.4th 666, 674 (6th Cir. 2021) (Thapar, J., concurring) (quoting The Federalist No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961)).

But there is a workaround. "In the modern administrative state, many 'laws' emanate not from Congress but from administrative agencies, inasmuch as Congress has seen fit to vest broad rulemaking power in the executive branch." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 951 (D.C. Cir. 1987) (Starr, J., concurring in part and dissenting in part). To preserve at least a modicum of democratic protections, Congress created the notice-and-comment requirements of the Administrative Procedure Act (APA), which provide public notice of a proposed rule and an opportunity for the public to express its concerns. *Id.* Whether successful or not, the aim is to ensure "that agency 'rules' are also carefully crafted (with democratic values served by public participation) and developed only after assessment of relevant considerations." *Id.*

Consistent with this scheme, Congress delegated to OSHA the authority to promulgate "occupational safety or health standard[s]" that are "reasonably necessary or appropriate" to address a "significant risk" of harm in the workplace. *See Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 642–43 (1980); 29 U.S.C. §§ 652(8), 655(b). Those standards must go through a notice-and-comment procedure. 29 U.S.C. § 655(b) (prescribing procedures similar to those of the APA).

This case, though, involves yet a more truncated process. Congress understood that emergencies might arise, and so it provided the Secretary with authority to bypass the public and the deliberative process, and to issue emergency temporary standards that "take immediate effect upon publication" and remain effective for six months. *Id.* § 655(c)(1), (c)(3). Because this is

such a departure from the ordinary processes, federal courts have recognized this authority as the "most dramatic weapon in [OSHA's] enforcement arsenal." *Asbestos Info. Ass'n/N. Am. v. Occupational Safety & Health Admin.*, 727 F.2d 415, 426 (5th Cir. 1984). It is an "[e]xtraordinary power" that "should be delicately exercised, and only in those emergency situations which require it." *Fla. Peach Growers Ass'n, Inc. v. Dep't of Lab.*, 489 F.2d 120, 129–30 (5th Cir. 1974); *see also Pub. Citizen Health Rsch. Grp. v. Auchter*, 702 F.2d 1150, 1155 (D.C. Cir. 1983) ("[E]mergency standards are to be used only in limited situations" and "only as an unusual response to exceptional circumstances." (quotation marks omitted)).

Perhaps wary of misusing such immense authority, OSHA has rarely invoked it. The agency has issued only ten previous emergency standards in the half-century that it has held that power. Six of those were challenged in court; five were struck down. *BST Holdings*, 17 F.4th at 609.

Congress too was wary of conferring this authority, "repeatedly express[ing] its concern about allowing the Secretary to have too much power" in this area. *Indus. Union*, 448 U.S. at 651. Accordingly, Congress "narrowly circumscribed" the Secretary's ability to use this considerable tool. *Id.* Before the Secretary may issue an emergency standard, he must "determine[] (A) that employees are exposed to *grave danger* from exposure to substances or agents determined to be toxic or physically harmful or from new hazards, and (B) that such emergency standard is *necessary* to protect employees from such danger."[3] 29 U.S.C § 655(c)(1) (emphases added).

So the Secretary's emergency authority extends no further than to issue temporary standards that are (1) necessary to protect employees from (2) grave danger. And because the Secretary's authority is to set "occupational safety and health standards," governing "employment and places of employment," the danger to be regulated must come from

---

[3]I assume here that the virus that causes COVID-19 constitutes a "substance[] or agent[] determined to be toxic or physically harmful" or a "new hazard," within the meaning of § 655(c)(1). Even if so, OSHA lacked authority to issue the rule.

(3) "exposure" in the workplace.  29 U.S.C. §§ 652(8), 655(c)(1); *Indus. Union*, 448 U.S. at 612.  I doubt the Secretary has met this test.

### a.  Necessary

The Secretary has not made the appropriate finding of necessity.  An emergency standard must be "necessary to protect employees from [grave] danger."  29 U.S.C. § 655(c)(1).  "Necessary," in the legal vernacular, is a tailoring word.  It asks how closely, or how loosely, a regulatory solution must fit a particular problem.  Sometimes "necessary" means simply "useful."  *Necessary*, Black's Law Dictionary (5th ed. 1979).  In those instances, the government may impose solutions that it thinks might help the problem, even if it ends up regulating a good deal more than it really needs to.  At other times, though, "necessary" means "indispensable." *American Heritage Dictionary of the English Language* 877 (1976).  Then, the government must stitch together its solution with more precision, regulating only as much as is critical to its mission.  Every American law student will be familiar with these dueling meanings of "necessary," prominently displayed in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819).  There, as here, the choice between meanings is revealed by context.

Consider first the textual differences between a permanent OSHA standard and an emergency one.  A permanent standard, issued after public notice and comment, need be only "reasonably necessary or appropriate" to address the problem at hand.  29 U.S.C. § 652(8); *see Indus. Union*, 448 U.S. at 642–43.  But when conferring emergency authority on the Secretary, Congress shaved that down to "necessary."  An emergency measure must, therefore, be more than "reasonably" needful; it must be closer to "indispensable."  *Cf. McCulloch*, 17 U.S. (4 Wheat.) at 413–15.  And then consider context.  The Supreme Court has already said that Congress "narrowly circumscribed" the Secretary's authority to issue emergency standards. *Indus. Union*, 448 U.S. at 651 & n.59.  It follows that, in this context especially, "necessary" must be read as a word of limitation, not enlargement.  *Cf. McCulloch*, 17 U.S. (4 Wheat.) at 420.

The majority opinion initially agrees with this statutory construction point.  It notes that an emergency standard must be more than "reasonably necessary"; it must be "essential."  Maj. Op. at 25.  But then that word, and the concept, disappear from the analysis.  What starts as a demand for an "essential" solution, quickly turns into acceptance of any "effective" or "meaningful[]" remedy, *id.* at 26–30; and later, acquiescence to a solution with a mere "reasonable" "relationship" to the problem, *id.* at 30.  The majority opinion never explains why "necessary" undergoes such a metamorphosis.

While the majority opinion starts with the right read on the statute, the Secretary seems to have missed this point altogether.  He made no finding that the emergency rule is "necessary" in any sense even approaching "indispensable."  We cannot uphold a rule based on a finding the agency never made.  *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

What the Secretary did say is that the agency's existing regulatory tools and "non-mandatory guidance" were insufficient.  86 Fed. Reg. at 61,440, 61,444.  In other words, OSHA believed there was a problem to be solved.  But the statute requires OSHA to find that the solution it actually picked—the nationwide vaccinate-or-test mandate—was "necessary" to solve the problem.[4]  *See* 29 U.S.C § 655(c)(1); *see also Asbestos Info.*, 727 F.2d at 426–27 (OSHA failed to show that an emergency standard was "necessary" when other means were available "to achieve the projected benefits.").  OSHA never makes that case.  Like the majority opinion, the Secretary focused on explaining why his solution will be effective.  86 Fed. Reg. at 61,434–39.  But that is not enough.  Many over-broad solutions might work; but they would not be a "necessary," or "indispensable," means of curing the ill.

---

[4]The statute requires the Secretary to find that "such" emergency standard is necessary.  29 U.S.C. § 655(c)(1).  In other words, he must find that *this* solution—the vaccinate-or-test mandate—is indispensable.  The majority opinion suggests that the Secretary's duty would be fulfilled if he found simply that "an" emergency standard (whatever its content) is necessary.  Maj. Op. at 6; *id.* at 26 (citing *Asbestos Info.*, 727 F.2d at 427).  That reading is inconsistent with the statutory text.

To the extent that the majority reads my opinion to say that an emergency standard must remove the grave danger from the workplace *entirely*, that is a misread.  I do not read "necessary" to require total elimination of the harm.

To illustrate (without intending to trivialize) OSHA's task, consider the danger from fire in a workplace: a pizzeria. One way to protect the workers would be to require all employees to wear oven mitts all the time—when taking phone orders, making deliveries, or pulling a pizza from the flames. That would be effective—no one would be burned—but no one could think such an approach necessary. What OSHA's rule says is that vaccines or tests for nearly the whole American workforce will solve the problem; it does not explain why that solution is necessary.

Bedrock principles of administrative law also support this point. It is a "quintessential aspect[] of reasoned decisionmaking" that an agency explore "common and known or otherwise reasonable options" and "explain any decision to reject" them. *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 818 (D.C. Cir. 1983); *see also Dist. Hosp. Partners, LP v. Burwell*, 786 F.3d 46, 58–59 (D.C. Cir. 2015) (holding an agency action arbitrary and capricious for failing to explain inconsistencies in the agency's own data when the data revealed a "significant and viable and obvious" alternative that the agency failed to consider (quoting *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215, 405 (D.C. Cir. 2013)). Emergency decisionmaking may lessen, but does not relieve, the agency of this basic responsibility. While a temporary measure may require "further refinement in the subsequent permanent standard," the agency should "not overlook those obvious distinctions . . . that make certain regulations that are appropriate in one category of cases entirely unnecessary in another." *Dry Color Mfrs.' Ass'n v. Dep't of Lab.*, 486 F.2d 98, 105 (3d Cir. 1973); *see also id.* at 107 (Emergency standard must explain "the alternative kinds of regulations considered by OSHA.").

OSHA's mandate applies, in undifferentiated fashion, to a vast swath of Americans: 84 million workers, 26 million unvaccinated, with varying levels of exposure and risk. 86 Fed. Reg. at 61,424. The burden is on "the agency to articulate rationally why the rule should apply to a large and diverse class." *United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 252 (2d Cir. 1977). The agency does not do so.

And it is easy to envision more tailored solutions OSHA could have explored. It might, for example, have considered a standard aimed at the most vulnerable workers; or an exemption

for the least. The government's own data show that unvaccinated workers between the ages of 18 and 29 bear a risk roughly equivalent to vaccinated persons between 50 and 64. *See* Ctr. for Disease Control, *Rates of COVID-19 Cases and Deaths by Vaccination Status* (last visited Dec. 16, 2021), https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status; https://perma.cc/8SU2-SVLZ. Or it might have considered a standard aimed at specific industries or types of workplaces with the greatest risk of COVID-19 exposure. Congress told the Secretary to "give due regard" to the need for standards "for particular industries" and types of "workplaces or work environments." 29 U.S.C. § 655(g). And OSHA acknowledges that death rates are higher in "[c]ertain occupational sectors," 86 Fed. Reg. at 61,415; yet its rule never considers what results would obtain from targeting those sectors alone. Would these, or other alternatives, have achieved similar results? We do not know because OSHA did not ask.

OSHA counters that given the COVID-19 emergency, rough-cut mandates are the best it can do. I see two problems with OSHA's assertion. First, even an emergency standard must consider "obvious distinctions" among those it regulates. *Dry Color*, 486 F.2d at 105. Here, there are many, none reflected in the emergency rule. Second, the agency's claim of emergency rings hollow. It waited nearly two years since the beginning of the pandemic and nearly one year since vaccines became available to the public to issue its vaccinate-or-test mandate. The agency does not explain why, in that time, it could not have explored more finely tuned approaches.

The majority opinion contends that to require more of OSHA would contradict the point of an emergency standard. But it offers no support for this proposition. It cannot be found in the text of § 655 itself. Indeed, as discussed, the only distinction apparent from the statutory text is that emergency standards should be *more* tailored to the problem, not less. The majority cites *Industrial Union* for the proposition that "OSHA may lean 'on the side of overprotection rather than underprotection' when promulgating an ETS." Maj. Op. at 28 (quoting *Indus. Union*, 448 U.S. at 656). But that case did not review an emergency standard, and in any event, the quoted language refers to "us[ing] conservative assumptions in interpreting the data" underlying a risk assessment. *Indus. Union*, 448 U.S. at 656. It says nothing about excusing OSHA from considering alternative means. Perhaps, instead, the majority relies on a bit of intuition;

circumstances demanding swift action often produce a less measured response. That may be true, but only so far as it goes. Surely, when an agency fails to *treat* a situation as an emergency, we should refuse to afford it any extra bit of deference, regardless of what label it attaches. *See Fla. Peach Growers*, 489 F.2d at 130–31 (addressing exposure to pesticides that had been used for years was not an emergency). Here, OSHA waited well over a year to respond to, in the agency's words, "the biggest threat to employees in OSHA's more than 50-year history." 86 Fed. Reg. at 61,424. To be sure, the agency may have had reasons for its wait-and-see approach—hoping individuals would vaccinate voluntarily, for example. *Id.* at 61,431–32. But that is beside the point. What matters is that the agency had plenty of time to consider and develop more tailored responses, belying any notion that its blunt approach is merely the expected product of an unexpected emergency.

Having failed to explore whether other feasible alternatives would have allowed him to tackle the problem, the Secretary cannot show that his solution is "necessary"; nor is he able to survive the requirements of "hard look" review. *See Asbestos Info.*, 727 F.2d at 421 (When reviewing an emergency standard, we must "take a 'harder look' . . . than we would if we were reviewing the action under the more deferential arbitrary and capricious standard applicable to agencies governed by the [APA].").

b. Grave Danger in the Workplace

This case can be resolved on the ground that the Secretary is unlikely to be able to show that the mandate was necessary. But there are also significant concerns with OSHA's determination that all unvaccinated employees face grave danger from exposure to the virus in the workplace. 29 U.S.C. § 655(c)(1).

*Grave danger.* "Grave danger" comprises two meanings. First, severity: A "grave danger" is a risk of "incurable, permanent, or fatal consequences to workers." *Fla. Peach Growers*, 489 F.2d at 132. The agency determined that symptomatic cases of COVID-19 can cause such consequences, 86 Fed. Reg. at 61,408, and no one seriously questions that finding. But the statutory concept of "danger," or risk, also carries a second connotation—the likelihood

of its occurrence. *See Asbestos Info.*, 727 F.2d at 424 (noting "gravity" includes "the number of workers likely to suffer [severe] consequences"); *Fla. Peach Growers*, 489 F.2d at 132 (measuring danger "relative to the mass of agricultural workers in contact with treated foliage"). I question whether the Secretary has made this second showing—that all covered employees have a high risk both of contracting COVID-19 and suffering severe consequences from it.

The agency must provide substantial evidence supporting the risk it has identified and give reasons for the conclusions it has drawn. *Asbestos Info.*, 727 F.2d at 421; *see also Dry Color*, 486 F.2d at 105–06. Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *Asbestos Info.*, 727 F.2d at 421 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Here, a quick look at the evidence raises an eyebrow. OSHA has determined that *no* vaccinated worker is in "grave danger," whereas *all* unvaccinated workers are. 86 Fed. Reg. at 61,434, 61,419. But the government's own data reveal that the death rate for *unvaccinated* people between the ages of 18 and 29 is roughly equivalent to that of *vaccinated* persons between 50 and 64. *See Rates of COVID-19 Cases and Deaths by Vaccination Status*, *supra*, at 10.[5] So an unvaccinated 18-year-old bears the same risk as a vaccinated 50-year-old. And yet, the 18-year-old is in grave danger, while the 50-year-old is not. One of these conclusions must be wrong; either way is a problem for OSHA's rule.

*In the Workplace.* OSHA's authority extends only so far as Congress provides. And Congress has clearly marked the perimeter of OSHA's authority: the workplace walls. *See* 29 U.S.C. § 651(a) ("work situations"); *id.* § 651(b) ("occupational safety and health standards") ("working conditions"); *see also Steel Joint Inst. v. Occupational Safety & Health Admin.*, 287 F.3d 1165, 1167 (D.C. Cir. 2002) ("[T]he Act authorizes OSHA to regulate only the employer's conduct at the worksite.").

The virus that causes COVID-19 is not, of course, uniquely a workplace condition. Its potency lies in the fact that it exists everywhere an infected person may be—home, school, or grocery store, to name a few. So how can OSHA regulate an employee's exposure to it?

---

[5]Hospitalization rates corresponding to these age groups is not readily available from the CDC.

OSHA answers that it has authority to protect employees from general types of hazards that may occur both inside and outside of the workplace. It may, for example, protect employees from the danger of workplace fire, even though every person in America has some risk of injury by fire outside the workplace. *See, e.g.*, 29 C.F.R. § 1910.157 (requiring fire extinguishers in the workplace). Sure. But one's exposure to fire may be easily differentiated by location, and OSHA has heretofore respected that its regulatory authority extends no further than the workplace walls. In *Industrial Union*, for example, the Court noted that although "[t]he entire population of the United States is exposed to small quantities of benzene" in the air, OSHA sought to regulate the increased risk of exposure to benzene only in the workplace. 448 U.S. at 615, 622–23. And the Fourth Circuit upheld OSHA's Occupational Noise Exposure standard because workers faced "sustained noise of great intensity" at work, which did not exist at those levels outside the workplace. *Forging Indus. Ass'n v. Sec'y of Lab.*, 773 F.2d 1436, 1442–44 (4th Cir. 1985) (en banc) ("The hazard is identified as sustained noise of great intensity-85 db and above. Non-occupational noise of that intensity sustained over a period of eight hours each day is hard to imagine.").

Yet OSHA admits that it "cannot state with precision the total number of workers in our nation who have contracted COVID-19 at work." 86 Fed. Reg. at 61,424. And it has not identified any particular rate or risk of workplace exposure to COVID-19. So instead OSHA determined that each of the 26 million unvaccinated workers are "in grave danger" based on "current mortality data show[ing] that unvaccinated people of working age have a 1 in 202 chance of dying when they contract COVID-19." *Id.* I can find no example of a court accepting generalized statistics like these, totally untied to the workplace. *Cf. Asbestos Info.*, 727 F.2d at 425–26. "The 'grave danger' and 'necessity' findings must be based on evidence of *actual*, prevailing [workplace] conditions, *i.e.*, current levels of employee exposure." *UAW v. Donovan*, 590 F. Supp. 747, 751 (D.D.C. 1984).

The risk the Secretary calculated to support his "grave danger" finding was in no way tied to any workplace. Instead, he calculated the risk of being a person "of working age" in America. 86 Fed. Reg. at 61,424. Indeed, in OSHA's eyes, the risk to an employee who starts a

job today is no more "grave" than it was yesterday, before she entered the workforce; and, should she quit tomorrow, it will remain the same. In other words, the Secretary did not calculate the number of people who will contract COVID-19 *at work*; he calculated the number of people *who happen to work* who would, in any event, contract COVID-19. That kind of risk assessment is hard to justify as an "occupational safety and health standard[]." 29 U.S.C. § 651(b)(3). And it is hard to square with Congress's codified mission statement for the Agency: to prevent "personal injuries and illnesses arising out of work situations." *Id.* § 651(a).

And what of the solution? Here, OSHA has ventured into entirely new territory. An authority to protect "employees" from a "grave danger" encountered in the workplace, *id.* at § 655(c)(1), is most naturally read to place a workplace boundary on the solution. Flame-retardant clothing may be mandated at work, but not also at home. And that is true even if taking such precautions at home would save many "employee" lives.

OSHA has never before acted otherwise. It has consistently regulated workplace hazards with workplace solutions. *See, e.g.*, 29 C.F.R § 1926.96 (steel-toe boots); *id.* § 1926.97 (electrical protective equipment); *id.* § 1926.100 (hard hats); *id.* § 1926.101 (ear protective devices); *id.* § 1926.102 (eye and face protection); *id.* § 1926.103 (respirators). Even its one foray into vaccines was offered to, but not required of, employees who had been exposed to Hepatitis B in the workplace. *See, e.g., id.* § 1910.1030(f)(2)(i). Here, employers, not employees, control any non-vaccine option in the first instance; and OSHA has been candid that it has stacked the deck in favor of vaccination. 86 Fed. Reg. at 61,437. OSHA has alerted us to no prior attempt on its part to mandate a solution that extends beyond the workplace walls— much less a permanent and physically intrusive one, promulgated on an emergency basis, without any chance for public participation. But that it is what OSHA has done here. A vaccine may not be taken off when the workday ends; and its effects, unlike this rule, will not expire in six months.

Accordingly, I question whether the Secretary can show that OSHA's risk assessment and solution are tied to its authority—to protect employees against grave danger in the workplace.

2.  Major Questions Doctrine

If there were doubt, the major questions doctrine tells us how to respond.  Congress must "speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'"  *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)).  And we should be skeptical when an agency suddenly discovers "in a long-extant statute an unheralded power to regulate a significant portion of the American economy."  *Id.* (quotation marks omitted).

OSHA has never issued an emergency standard of this scope.  Each of this rule's few predecessors addressed discrete problems in particular industries.  *See* 48 Fed. Reg. 51,086, 51,087–93 (Nov. 4, 1983) (targeting workplaces where "asbestos is handled," specifically 375,000 employees in manufacturing, construction, fabrication, brake repair, and shipbuilding); 43 Fed. Reg. 2,586, 2,593 (Jan. 17, 1978) (targeting acrylonitrile manufacturing, acrylic fiber production, and similar activities with the "highest exposure" to acrylonitrile); 42 Fed. Reg. 45,536, 45,536 (Sept. 9, 1977) (targeting DBCP manufacturers, specifically 2,000 to 3,000 employees in a handful of companies); 42 Fed. Reg. 22,516, 22,517–22 (May 3, 1977) (targeting 150,000 employees in the chemical, printing, lithograph, rubber, paint, varnish, stain remover, adhesive, and petroleum industries with high exposure to Benzene, but exempting retail gas stations); 41 Fed. Reg. 24,272, 24,275 (June 15, 1976) (targeting 2,305 commercial divers); 39 Fed. Reg. 12,342, 12,343 (Apr. 5, 1974) (targeting vinyl chloride manufacturers, processers, and storers); 38 Fed. Reg. 10,929, 10,929 (May 3, 1973) (targeting 14 carcinogens when manufactured, processed, used, repackaged, released, or otherwise handled, as requested by oil, chemical, and atomic workers); 38 Fed. Reg. 17,214, 17,216 (June 29, 1973) (targeting field workers exposed to 12 pesticides, but limited to crops of apples, citrus, grapes, peaches, and tobacco); 36 Fed. Reg. 23,207, 23,207 (Dec. 7, 1971) (targeting workplaces with extremely high levels of asbestos).  Most of those were challenged in court and only one of those survived.  Now the Secretary claims authority to impose a vaccinate-or-test mandate across "all industries" on 84 million Americans (26 million unvaccinated) in response to a global pandemic that has been raging for nearly two years.  86 Fed. Reg. at 61,424.  But no congressional grant of authority

does what the Supreme Court requires in such circumstances: speak with "exceedingly clear language." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489.

The majority deems the major questions doctrine inapplicable, first because, in its eyes, OSHA's authority to undertake a nationwide vaccine-or-test mandate is "unambiguous." Maj. Op. at 16. It rests that conclusion primarily on the fact that OSHA has been regulating workplace health and safety since 1970. But the major questions doctrine is not about the age of the agency; and it is not only about the *kind* of power but also the *scope* or *degree*. Claiming that it made no such error, the majority doubles down with examples of OSHA exercising power similar in kind and calls that "scope." But no matter how many times OSHA has regulated discrete illnesses in particular workspaces, this emergency rule remains a massive expansion of the scope of its authority. In *Brown & Williamson*, the FDA had been regulating "drugs" and "devices" for 58 years. 529 U.S. at 125. And regulating nicotine seemed to fit in the FDA's wheelhouse. *See id.* at 127. Nonetheless, the Court denied the FDA's authority to make "a policy decision of such economic and political magnitude"—even one in the agency's ken, and even though tobacco was "perhaps the single most significant threat to public health in the United States" at the time.[6] *Id.* at 133, 161.

Just months ago, the Supreme Court rejected a similar attempt by a different agency to take the pandemic into its own hands. *See Ala. Ass'n of Realtors*, 141 S. Ct. at 2486. The CDC had imposed an eviction moratorium for any counties with high levels of COVID-19 transmission, citing its authority in the Public Health Act to make "such regulations as . . . are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries." *Id.* at 2487. Deciding that a challenge to the moratorium was "virtually certain to succeed on the merits," the Court found that even if the provision could be read that

---

[6]The majority thinks *Brown & Williamson* is distinguishable because there Congress had directly spoken on the issue of tobacco, which was further evidence that the FDA had no such authority. *See* 529 U.S. at 137–39. However, in *Utility Air Regulatory Group*, the Supreme Court reaffirmed the language in *Brown & Williamson* and applied it even where Congress had been silent. *See* 573 U.S. at 307, 324 (finding that an EPA determination "that its motor-vehicle greenhouse-gas regulations automatically triggered permitting requirements" was an "enormous and transformative expansion" in authority that triggered *Brown & Williamson*). *Utility Air Regulatory Group* is yet another example of the Supreme Court applying the major questions doctrine to a regulation similar in kind but with an increased scope.

way, "the sheer scope of the CDC's claimed authority" belied the government's interpretation. *Id.* at 2489.

The majority gives short shrift to this very recent precedent, calling the major questions doctrine a "seldom-used . . . exception to *Chevron* deference." Maj. Op. at 14. It is hard to see how that can be right when *Alabama Association of Realtors* just applied the doctrine and *Chevron* made no appearance in the case. The majority protests that the doctrine is "hardly a model of clarity" and that "economic and political significance" is undefined. *Id.* Maybe so. Yet it is hard to think of a more apt comparison than the one the Supreme Court just gave us to follow. Finding it to be a power of "vast economic and political significance," the Court emphasized that the CDC's moratorium covered "80% of the country, including between 6 and 17 million tenants," all to "combat[] the spread of COVID-19." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489–90. OSHA's rule covers two-thirds of the private sector, including 84 million workers (26 million unvaccinated), also to combat COVID-19. 86 Fed. Reg. at 61,424–41. If it is not clear on its face that OSHA's vaccinate-or-test mandate covering most of the country is significant, then *Alabama Association of Realtors* tells us it is.

Finally, the majority tries to escape the doctrine by claiming that the Secretary's authority is carefully circumscribed by the requirements in § 655 that the rule be "necessary" to combat a "grave danger," and that OSHA has "honored those parameters" by using its power infrequently. Maj. Op. at 16. Two short responses are in order. One, the provision in *Alabama Association of Realtors* was similarly circumscribed; the CDC could act only when it was "necessary" to prevent the "spread of communicable disease," and it had "rarely . . . invoked" its power. 141 S. Ct. at 2487. Two, the fact that § 655 "narrowly circumscribe[s]" OSHA's authority, *Indus. Union*, 448 U.S. at 651, and that its assertions of power in the past have been limited, supports a restrictive reading, not an expansive one.

A last point bears mention. Congress may enlist the help of administrative agencies to implement and enforce the laws, as it has done here. *See Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019). But there are limits to how much Congress may delegate. *See id.* And the greater the putative delegation of power, the less discretion an agency has when exercising it.

*See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001) ("[T]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred.").

Here, the Secretary asks for maximum authority *and* maximum discretion; he wants to issue a rule of national import, covering two-thirds of American workers, and he wants to do it without clear congressional authorization, without even public notice and comment, and with a capacious understanding of necessity. Such a combination of authority and discretion is unprecedented, and the Secretary is unlikely to show that he has been granted it.

## B.  Other Stay Factors

Petitioners have shown a likelihood of success on the merits of their challenge to the emergency rule. That factor is the most important; but the other factors favor the stay as well.

Will petitioners be irreparably harmed absent a stay? Yes. *Nken v. Holder*, 556 U.S. 418, 434 (2009). Consider just two classes of petitioners. First, individuals. Without a stay, they will be forced to decide whether to get vaccinated. In some cases, employers may permit employees to undergo weekly testing and wear a mask. But some will fire those who are not vaccinated, rather than deal with the recordkeeping hassles of the testing requirement. In those instances, the individuals will be irreparably harmed, either by loss of livelihood or an unwelcome vaccination. And even if given the choice by her employer, an individual petitioner might reluctantly submit to vaccination, rather than incur a weekly hit to her finances and to her time. And if it turns out she did so due to an invalid regulation, she will have been irreparably harmed.

Second, businesses. The business petitioners say they will be harmed in various ways, including unrecoverable compliance costs and loss of employees amidst a labor shortage. For example, one petitioner, Oberg Industries, says that it will incur more than "$22 million in lost revenue per year," and that the vaccinate-or-test mandate "will imperil Petitioner's business going forward given significant labor market shortages." Docket Nos. 21-7000, 21-4112, Motion for Emergency Stay at 2. Currently, the company has 21 open positions and, according

to Oberg, "studies show that at least seven million affected workers report that they definitely will not get the vaccine." *Id.* The vaccinate-or-test mandate will exacerbate these shortages, with Oberg estimating that it will lose "200 employees—approximately 30% of its existing workforce." *Id.* at 2–3. The papers before this court are filled with similar stories. There is no question that if these harms occur, they will be irreparable.

OSHA responds that the administrative record it compiled does not support the alleged severity of petitioners' harms. Of course the record is silent as to petitioners' concerns, given that the emergency standard circumvents any public input. And while OSHA says its projected costs are much lower than petitioners', the projected costs are not *de minimis*, ranging from as little as $2,000 to almost $900,000 per entity, with a combined projected cost of almost $3 billion. 86 Fed. Reg. at 61,493.

Would the stay substantially injure OSHA and where does the public interest lie? *Nken*, 556 U.S. at 434. These two factors merge when the government is a party. *Id.* at 435. It is hard to find harm to OSHA from delay, as it waited almost two years since the pandemic began, and nearly a year after vaccines became publicly available, to issue the mandate. That is not to mention the almost two-month delay between the President's mandate announcement and the issuance of the emergency standard.

As for the societal costs of the pandemic, few could dispute their size and scope. To focus on just one, in many states, the healthcare system is being overrun and many healthcare workers report both a physical and emotional toll from the relentless effort of caring for the sick and dying. *See Michigan's Hospitals Near Breaking Point: 'We Can't Take Care of Our Patients as We Need'*, The Detroit News (last visited Dec. 15, 2021), https://www.detroitnews.com/in-depth/news/nation/coronavirus/2021/12/15/michigan-hospitals-crisis-health-care-workers-exhausted-covid-19-pandemic/6462036001/. The agency record in this case contains substantial evidence that we could give them some rest if more of us rolled up our sleeves. But the Secretary himself claims no authority to regulate for these ends. He cannot even regulate for the sake of the vaccinated; they are not in "grave danger." Instead, the mandate is aimed directly at protecting the unvaccinated from their own choices. Vaccines are freely

available, and unvaccinated people may choose to protect themselves at any time. And because the Secretary likely lacks congressional authority to force them to protect themselves, the remaining stay factors cannot tip the balance. *See Tiger Lily*, 992 F.3d at 524.

\* \* \*

I would deny OSHA's motion to dissolve the stay.